174 So. 180

**SOUTHERN BELL TELEPHONE & TELE-GRAPH CO., Inc., v. LOUISIANA PUB-LIC SERVICE COMMISSION.**

No. 33978.

March 1, 1937.

Rehearing Denied April 26, 1937.

See, also, 185 La. 729, 170 So. 548.

Gaston L. Porterie, Atty. Gen., and James P. O'Connor, Henry O'Connor, and Joseph A. Loret, Sp. Asst. Attys. Gen., for appellant.

C. C. Bird, Jr., of Baton Rouge, J. C. Henriques and Charles J. Rivet, both of New Orleans, and E. D. Smith and John T. Goree, both of Atlanta, Ga., for appellee.

ODOM, Justice.

In the latter part of 1934, the Louisiana Public Service Commission, hereinafter referred to as the Commission, on its own motion, instituted a proceeding styled Louisiana Public Service Commission v. Southern Bell Telephone Co., Inc. (hereinafter referred to as the Company), its purpose being to investigate the reasonableness of the rates and charges established by the Company in Louisiana. The Company serves about 100 exchanges in the state and furnishes toll service between these exchanges as well as other exchanges owned either by it or companies affiliated with it, in a group of nine southern states.

After making its preliminary investigation, the Commission notified the Company to appear at an initial hearing set for December 13, 1934. The Company appeared and introduced the testimony of several witnesses and filed in evidence numerous exhibits. The hearing was continued to and resumed on January 24, 1935, when additional witnesses were called and other exhibits filed by the Company. At these hearings the Company called 7 witnesses, all its own employees, and filed in evidence some 57 exhibits.

The Commission's testimony was introduced at a final hearing on February 5, 1935. Its witnesses were Mr. Mark Wolff,

a public utility consultant of Chicago and New York, and his staff of engineers and accountants, among them being Mr. Harold M. Olmsted, Mr. Hugh W. Abbett, an appraisal engineer for the Indiana Public Service Commission, and Mr. George S. Call, a certified public accountant, who was formerly chief of the Bureau of Accounts of the Pennsylvania Public Service Commission. These had all been previously employed by the Commission to assist in making the investigation touching the question whether or not the rates and charges established by the Company in Louisiana were reasonable. In connection with the testimony of its witnesses, the Commission filed in evidence numerous exhibits in the way of charts, estimates, calculations, etc.

After all the testimony was put into the record and the case was argued by counsel for both sides, the Commission issued its order No. 1530, dated March 2, 1935, by which new rates and charges were established. As a result, the Company's annual net earnings in Louisiana will be reduced, if the new rates are allowed to go into effect, by slightly more than $600,000.

The Company, on March 8, 1935, went to court with a suit in which it attacked the order of the Commission and sought to have it set aside on the grounds, mainly, that it was arbitrary, unreasonable, unconstitutional, and that the rates fixed were confiscatory. It alleged specifically that the methods adopted by the Commission in arriving at a valuation of its property used and useful in furnishing exchange service in Louisiana were so

arbitrary and contrary to well-recognized methods that they were violative of the due process provision of the United States Constitution, as set forth in the Fourteenth Amendment, and as set out in section 2, article 1, of the State Constitution.

It was alleged that an examination of the findings of fact made by the Commission showed that the conclusions reached by the Commission were (a) without evidence to support them; (b) contrary to the evidence introduced; (c) based on evidence not legally cognizable; (d) founded on evidence not introduced; (e) based on methods which were wrong for determining the value of property; and (f) violative of the rudiments of fair play, and that the errors of law or procedure were so arbitrary and flagrant as to be violative of the due process of law guaranteed by both the Federal and State Constitutions.

It was further specifically alleged that the rates fixed by the Commission by its order No. 1530 were so low, unreasonable, and inadequate that they would not and could not yield a reasonable return on the fair value of the Company's property useful and used in furnishing exchange telephone service or intra-telephone service in Louisiana.

In sum and substance the Company's complaint before the court was that in arriving at the rates fixed in its order No. 1530, the Commission used what the Supreme Court of the United States in West v. Chesapeake & P. Telephone Co., 295 U.S. 662, 679, 55 S.Ct. 894, 901, 70 L.Ed. 1640, called a "rough and ready" method of arriving at values and fixing rates, and that the rates fixed were so low that, if allowed to stand, they would result in confiscation of its property or the taking of its property without due process of law.

It asked the court to set aside the Commission's order, and further prayed that the Commission be restrained from putting its order into execution pending the final outcome of the case on its merits. The injunctive relief sought was denied. A trial of the case on its merits resulted in a judgment canceling and setting aside the Commission's order No. 1530. From that judgment, the Commission appealed to this court.

If it be true as a matter of fact that the rates fixed by the Commission by its order No. 1530 are so low that the operation of the Company's business under them will amount practically to a confiscation of its property, then as a matter of law the order is illegal and cannot stand.

■ Public service corporations operating in Louisiana are subject to strict legislative supervision and control, especially with reference to matters relating to rates and charges made for services rendered to the public. The machinery set up by the Legislature for the exercise of its right of supervision and control of such corporations is a state agency designated as the Louisiana Public Service Commission. This Commission is authorized and empowered by special legislative acts to institute, on its own motion, and prosecute investigations to ascertain whether or not the rates and charges made by public service corporations for services rendered are reasonable and fair.

If, after investigation, the Commission reaches the conclusion that the rates or charges are excessive, it may reduce them.

But the Commission's power and authority to fix rates and charges is limited always by the fundamental law laid down by the Fourteenth Amendment to the Constitution of the United States, which is that no state may "deprive any person of * * * property, without due process of law," and by section 2, article 1, of the State Constitution which says that "no person shall be deprived of * * * property, except by due process of law. Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid."

It must be conceded that if the state, through its agency, the Commission, has by its order in this case so limited the rates and charges which the Company may make for the services which it must render its subscribers and patrons as to reduce its net returns to the point where it cannot realize "just and adequate compensation" on the present fair value of its property, the order is illegal and must be set aside, because its effect will be to take the Company's property without due process of law. The state can no more do that than it could, by the exercise of its power of eminent domain, take private property for a public purpose without paying its true value at the time of taking.

The basic theories underlying the Company's attack upon the Commission's or-

der in this case are: (1) That it resorted to unauthorized and illegal methods in determining the value of the Company's property used and useful in the operation of its business, and (2) that the rates fixed are confiscatory.

Before establishing rates and charges which a public service corporation may make in a case of this kind, the Commission must first of all determine the just and true value of the Company's property useful and used in the business at the time the rates are fixed. This done, it is enabled, after ascertaining the net amount derived from the operation of the company's plant, to determine what are fair, reasonable rates and charges, and to fix them so as to yield a reasonable, fair return on the investment and at the same time protect the rights of the rate payers.

In fixing rates, the use of an erroneous valuation of the property involved would necessarily result in harm and injustice either to the stockholders of the Company or to the rate payers. If the valuation is too low, it is the stockholders who suffer, and if too high, it is the rate payers. So that extreme caution must always be used in determining the value of the property.

By this we do not mean to say that it is necessary for the Commission to fix what might be termed an exact or precise value of all the property, for in the very nature of things this cannot be done. As was said by the court in the case of West et al. v. Chesapeake & Potomac Telephone Company of Baltimore, 295 U.S. 662, 55 S.Ct. 894, 898, 79 L.Ed. 1640, 1641:

"But it is to be remembered that such a property as that here under consideration is a great integrated aggregate of many and diverse elements; is not primarily intended for sale in the market, but for devotion to the public use now and for the indefinite future; and has, so far as market value is concerned, no real resemblance to a bushel of wheat or a ton of iron."

And in the same case the court said, "To an extent value must be a matter of sound judgment, involving fact data."

In the case of Los Angeles Gas & Electric Corporation v. Railroad Commission, 289 U.S. 287, 53 S.Ct. 637, 643, 77 L.Ed. 1180, the court said:

"The legislative discretion implied in the rate-making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself."

This language was quoted with approval in the West Case, supra. So that it is true, as counsel for the Company argue, that the method used by the Commission in this case in reaching its determination of proper rates, which necessarily involves its method of arriving at the value of the Company's property, is of prime importance. If that method was fundamentally unsound, then the "determination itself" was likewise unsound. The Commission is not permitted to use "crack down" or "rough and ready" methods in fixing values. Such methods were not only discredited but denounced in the West Case, supra.

Whether the Commission used such methods in this case is one of the prime questions involved.

The trial judge thought it did, and for that reason set aside the Commission's order. He followed the ruling in the West Case, which had not been published when the Commission issued its order. He seems to have been of the opinion that the West Case is on all fours with this one. After a reading of the West Case and after considering the methods used by the Commission in this case to determine the value of the Company's property, we have reached the conclusion that the judge erred in finding that the methods used in the two cases are the same.

In the West Case the Commission made no appraisal of the physical plant and property of the Company, but, as the court said, "attempted to determine present value by translating the dollar value of the plant as it was found by the District Court in the earlier case at December 31, 1923, plus net additions in dollar value in each subsequent year, into an equivalent of dollar value at December 31, 1932."

In "translating" the dollar value the Commission used an index figure, or "fair value index," obtained by means of "commodity indices" intended to show price trends. It selected 16 of these commodity indices, "one covering as many as 784 commodities, falling into different classes, and weighted for averaging. * * * The commission then weighted these sixteen indices upon a principle not disclosed, giving them weights of from one to four, and thus got a divisor of thirty-one for

the total obtained by adding the weighted results of all. This gave what the commission styled its 'fair value index,' which it applied to the 1923 value of the property then owned and to cost of all net additions in subsequent years, to obtain value as of 1932."

The opinion shows that the Company "submitted proof of estimated reproduction cost and accrued depreciation" and none was offered in opposition. The Commission seems to have disregarded entirely the Company's testimony, for the court said: *"The valuation was based squarely on the figures obtained by the use of its index. * * * The commission relied solely upon the figure resulting from trending the dollar value* of plant owned in 1923 and cost of net additions subsequently made."* (Italics ours.)

The court did not repudiate the practice of price trending, for it said:

"This is not to suggest that price trends are to be disregarded; quite the contrary is true. And evidence of such trends is to be considered with all other relevant factors." Citing St. Louis & O'Fallon R. Co. v. United States, 279 U. S. 461, 485, 49 S.Ct. 384, 387, 73 L.Ed. 798; Clark's Ferry Bridge Co. v. Public Service Commission of Pennsylvania, 291 U.S. 227, 54 S.Ct. 427, 78 L.Ed. 767.

What it held was that the Commission was not warranted in basing its conclusion as to present fair value solely upon price trends or dollar trends. The opinion clearly shows (1) that the Commission in fixing the value of the Company's property relied solely upon the figures result-

ing from trending the dollar value, and (2) that the "proof" submitted by the Company of estimated reproduction cost and of accrued depreciation was not considered. This, in effect, amounted to condemnation without a hearing.

■ In this respect the West Case is distinguishable from the one at bar. Here the Commission had before it these so-called "commodity indices," which were referred to by its witnesses, who considered price trends also as indicated by them. The Commission did not, as in the West Case, base its valuation squarely upon the figure obtained by the use of them or rely solely upon the figures resulting from trending the dollar value. It took into consideration price trends as one of the elements in fixing value. This was not only permissible, but proper.

At page 4 of the Commission's printed report, under the general heading "Valuation," after saying that "Mark Wolff's exhibits Nos. 1 to 10 inclusive show that general and other average price levels were lower in October, 1934, in all but three years of the period during which this property was constructed piecemeal," and after mentioning bulletins published by the United States Bureau of Labor Statistics and "Bradstreet's Index," "construction material trends" and the "price level index of the Federal Land Bank of New York," it is said:

"Certainly, indices from such responsible and unbiased authorities as the U. S. Bureau of Labor Statistics, Bradstreet's rating agency and the Federal Reserve Bank, are entitled to great weight

considering that two out of the three are representative of capital."

So it appears that the Commission did attribute "great weight" to these factors. But did not rely solely upon them in fixing the valuation of the Company's property.

The report itself shows that other factors were considered.

The Commission, after hearing and considering the testimony of all the witnesses, both those called by it and those called by the Company, reached the conclusion that the present fair value of the Company's property used and useful in connection with its business both interstate and intrastate was approximately $21,500,000, of which $19,500,000 was used in intrastate business and was made the rate base.

While the company contended that its stockholders were entitled to a return of 8 per cent. on their investment, the Commission thought that 6 per cent. was sufficient and fixed that as a reasonable, fair return. Having fixed what it considered a proper rate base and a fair return to the stockholders, it took data furnished by the Company from its books showing the Company's gross annual receipts from intra-state business, its operating expenses and its net earnings, and found that the Company was earning much more than 6 per cent. on the present fair value of its property. It then proceeded to divide the state into districts or zones and adopted a schedule of rates, charges, and tariffs for each zone separately, and ordered that they be put into effect immed-

iately. The result was that if the rates and charges thus fixed were carried into effect, the company's net earnings on intra-state business would be reduced approximately $600,000 per annum. The rates fixed, however, were sufficient to enable the Company to earn at least 6 per cent. for its stockholders on the basis of the present fair value of the property used in its intra-state business as found, but not sufficient to yield that much on the Company's estimate of the fair value of its property used and useful in its intra-state business.

So that the all-important question presented is whether the Commission in fixing what it considered a fair value of the Company's property at the date of the investigation and order acted arbitrarily and without sufficient evidence in reaching its conclusion. And here we may say that if the Commission's finding as to the fair value is correct, no fault can be found with the rates and tariffs fixed.

According to the data furnished by the Company, which was accepted by the Commission, the capital invested in the plant up to December 31, 1934, was $33,-399,982, and according to the Company's estimate, which was also accepted by the Commission, the plant could be reproduced new at a cost of $33,609,100, or $209,118 more than its original cost.

In reaching what it considered present fair value, the Commission used two methods of computation, each producing practically the same results. It first deducted from $33,399,982, the book cost of the plant, the sum of $9,349,263, which

was referred to in the tabulation as "depreciation reserve," but in reality was the amount of accrued depreciation found by the Commission, leaving a balance of $24,-050,719. To that amount it added $301,-878, the value of materials then on hand, the two sums totaling $24,352,597, which represented the value of the plant as depreciated; and from that amount it deducted $3,044,075, being 12½ per cent. for "excess plant," and to the remainder added $100,000 for "cash working capital," reaching the figure of $21,408,522 as the present fair value of the property.

The other computation was this: From $33,609,100, the Company's estimate of reproduction cost new, it deducted $2,106,-500, or 6 per cent. for "excess prices," the remainder being $31,592,600. From this it deducted $7,431,315, designated in the table as "Depreciation reserve—Company's apportionment, as representing existing depreciation," leaving $24,161,285. To this sum was added $301,878 for materials and supplies on hand, making $24,-463,163, from which was deducted $3,057,-895, or 12½ per cent. for "excess plant," leaving $21,405,268, to which amount was added $100,000 for "cash working capital," resulting in the figure of $21,505,268 as the present fair value of the property, this being approximately $100,000 more than the result reached by the other method of computation. The result of these computations being practically the same, the Commission fixed $21,500,000 as the present fair value.

That neither the original book cost of the property nor its reconstruction cost

new should be considered present fair value must be, and in fact is, conceded. This is because the element of depreciation must be considered.

In fairness to the rate payers, if the Company's property has declined in value from whatever cause, the present value, not the original cost nor the cost of reproduction new should be considered. On the other hand, if the Company's property has enhanced in value, it should be given the benefit of the rise. As said by Mr. Justice Roberts, organ of the court in the West Case cited supra, 295 U.S. 662, 55 S.Ct. 894, at page 898, 79 L.Ed. 1640:

"It is true that any just valuation must take into account changes in the level of prices. We have therefore held that where the present value of property devoted to the public service is in excess of original cost, the utility company is not limited to a return on cost. Conversely, if the plant has depreciated in value, the public should not be bound to allow a return measured by investment. Of course the amount of that investment is to be considered along with appraisal of the property as presently existing, in order to arrive at a fair conclusion as to present value, for actual cost, reproduction cost and all other elements affecting value are to be given their proper weight in the final conclusion."

To the same effect was the ruling in Los Angeles Gas & Electric Corporation v. Railroad Commission of California, 289 U.S. 287, 53 S.Ct. 637, at page 644, 77 L.Ed. 1180, where Chief Justice Hughes, organ of the court, said:

"The actual cost of the property—the investment the owners have made—is a relevant fact. Smyth v. Ames, 169 U.S. 466, 547, 18 S.Ct. 418, 42 L.Ed. 819. But, while cost must be considered, the Court has held that it is not an exclusive or final test. *The public have not underwritten the investment.* The property, on any admissible standard of *present value,* may be worth more or less than it actually cost." (Italics ours.)

In the case presently under consideration, the fact that the Company's property, its plant as a whole, had greatly depreciated in value at the date of the investigation and order is undeniable. The Commission so found and held after considering all the elements affecting value, such as original cost, reproduction cost new, accrued or existing depreciation, and general price and value trends.

The Company's books show that the historical or original cost of the entire plant as it stood at the date of the hearing was $33,399,982, which is the sum total of the cost of every item of material used whether raw or manufactured, the cost of lots, lands, servitudes, or rights of way, and the cost of labor. In sum, the cost of all items and elements which entered into the completed structure.

The Company's engineer, Mr. Hill, made for it an estimate of the cost of reconstructing the plant new as of date October 31, 1934, his estimate being $33,-609,100, or $209,118 more than the original cost. In making this estimate, he presumably took into consideration the essential elements of cost of material, supplies, and equipment of every description and the cost of labor as well as the value of grounds, lots, rights of way, and servitudes. He was estimating the cost new of a complete plant as of date October 31, 1934. The fact that his estimate exceeded by more than $200,000 the original cost of the plant indicates, if it does not show conclusively, that the prices and values considered by him in making this estimate were practically on par with those which entered into the original construction.

The testimony adduced at the hearing disclosed that the Company's plant was built, in the main, prior to that period in our recent history commonly referred to as the "depression," which resulted in an economic condition not only in this state but throughout the entire country which was recognized by the Supreme Court of the United States as such an "emergency," such a "crisis" as "furnished a proper occasion for the exercise of the reserved power of the state to protect the vital interests of the community," an occasion for the enactment of legislation "for the protection of a basic interest of society" (Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 242, 78 L.Ed. 413, 88 A.L.R. 1481), an occasion which the Legislature of this state (Act No. 159 of 1934) said was "an emergency of such a nature that justifies and validates legislative authority for the temporary suspension of the laws relative to mortgage foreclosure sales"; an occasion which had brought about, to quote the language of the act, a "severe financial and economic depression" which had "re-

sulted in extremely low prices for the products of the farms and the factories and for real property, a great amount of unemployment, an almost complete lack of credit for farmers, business men and property owners and a general and extreme stagnation of business, agriculture and industry."

The act of the Louisiana Legislature, No. 159, was adopted and approved by the Governor on July 13, 1934, prior to the date on which Mr. Hill made his estimates for the Company. That act was held to be constitutional by this court in the case of Metropolitan Life Ins. Co. v. Morris, 181 La. 277, 159 So. 388.

The witnesses called by the Commission testified, and the testimony was not denied (nor could it be) that since the major portion of the Company's plant was built, there had been a slump in prices of commodities of all kinds, of raw materials as well as manufactured supplies and utilities used by the Company in building and assembling its plant as a whole, that the price of labor, an important factor, had greatly declined—that there had been a general downward trend in prices and values. In connection with the testimony, the witnesses referred to commodity indices prepared to show price trends, but did not rely solely upon them.

The Commission would, we think, have been warranted in taking official notice, as courts have done, of this general downward trend in price and value levels. In the Los Angeles Case, supra, 289 U.S. 287, 53 S.Ct. 637, at page 645, 77 L.Ed. 1180, the court said:

"We have had occasion to take judicial notice of the high level of prices of labor and materials prevailing not only from 1917, as an incident to the war, but also in 1922 and 1923, and that there was no 'substantial general decline' in such prices from that time to 1926." Citing several cases.

The court in that case said further (289 U.S. 287, 53 S.Ct. 637, at page 646, 77 L. Ed. 1180):

"But we know that the estimates of present value, taken as the cost of reproduction as of December 31, 1929, based upon average prices from 1926 or 1927 to 1929, furnished no dependable criterion of values in the succeeding years. The country was facing a most serious decline in prices. It was entering upon a period of such depression as to constitute 'a new experience to the present generation.' "

The testimony shows that since the general slump, there had been no appreciable rise in price and value levels up to October, 1934, when Mr. Hill's estimate of the reproduction cost new of the Company's property was made, and since his estimate was evidently based upon prices and values practically the same as those prevailing when the plant was originally built, it formed no "dependable criterion of value" in 1934. Whether Mr. Hill's estimate of the reproduction cost of the plant in October, 1934, is correct, depends upon whether the price and value levels used by him in making that estimate were correct. The Commission found that they were too high and deducted 6

per cent. for excessive prices, amounting to $2,016,500.

This deduction was an estimate reached by considering various calculations made by the witness and the general downward trend of price and value levels. In Hill's estimate he valued the lands at $423,400, whereas the book cost was only $360,880. Hill's affidavit showed that the present fair value of the land was $399,204, or $24,196 less that the value used in his estimate. He figured interest rates at 8 per cent., which the Commission found was too high. It was shown that a large percentage of the equipment and materials used by the Company in constructing its plant originally, and which Hill figured as going into the plant if built new, were assembled, or manufactured and sold to the Company by the Western Electric Company, a corporation owned and controlled by the American Telephone & Telegraph Company, of which the Southern Bell Telephone Company, the plaintiff here, is a subsidiary. It was shown that the Western Electric Company enjoyed a monopoly in so far as sales to the Southern Bell Telephone Company were concerned, and that its prices, instead of trending downward as all other prices had, had trended progressively upward from about 1930 to October, 1934.

The increase in these prices was shown in detail on a statement furnished by the Company. It shows that in September, 1930, there was an increase of 10 per cent. in the price of certain types of standard switchboards, 25 per cent. for frame work, assembly and wiring the same. Certain other standard switchboards were in-creased 15 per cent., the frame work 25 per cent., and assembly and wiring 35 per cent. On November 1, 1930, further increases from 6 per cent. to 20 per cent. were made. Then on January 1, 1934, further increases from 6 per cent. to 20 per cent. were made, and another increase on July 1, 1934. Hill's reproduction estimate goes into detail showing instances where it exceeded the book cost. It showed that for central office telephone equipment, the reproduction cost exceeded book cost by $1,261,486, and for station apparatus $172,961, a total of $1,434,447.

In Hill's estimate of reproduction cost new, he included an item for interest on capital during construction of $1,567,800, which interest was calculated on the basis of 8 per cent. and includes interest on lands amounting to $30,878. The Commission found that the rate of interest used by Mr. Hill was excessive by at least 2 per cent., its finding being that 6 per cent. was a reasonable rate. It disallowed interest on lands altogether, which was correct under several decisions of the United States Supreme Court. Taking the increase in prices on switchboard and central office equipment, amounting to $1,-434,447, the excessive amount of interest, totaling $415,108, and the excessive land values amounting to $24,196, the grand total is $1,873,751, which amounts to approximately 6 per cent. of the reproduction cost new of the Company's property used in its intra-state business. These figures did not take into consideration the decline in the price of labor from 1930 to the end of 1934. So that it will be

seen that the Commission's deduction for excess prices is substantially correct.

The Company's statement shows also that Hill's estimate on certain items was less than book cost, as in the case of cable, also furnished by the Western Electric Company, where the estimated cost was $700,173 less than book cost. There is also testimony showing that some of the items entering into Hill's estimate had not, as a matter of fact, increased in price, but had declined slightly.

It would serve no useful purpose to go into detail as to what the eight volumes of testimony and exhibits show on the specific points in dispute. The outstanding facts are that this estimate of the reproduction cost of the plant new was made in October, 1934, when the price of labor, the price of materials of all kinds, both raw and manufactured, and the value of real estate had slumped to a level which threatened disaster. And yet the estimated cost of reproduction exceeded the book cost by more than $200,000. Considering the testimony as a whole, we think the Commission's correction of the estimate was proper.

It deducted 6 per cent. from the estimate on account of excessive prices and values. It may be that mathematically this is a fraction too high or too low. But based upon figures and the calculations of experts which we find in the record, it is substantially correct and we approve the Commission's findings on this point.

From the Company's estimate of the reproduction cost new of the plant, the Commission deducted $7,431,315 for existing or accrued depreciation. We understand that counsel for the Company concede that in order to arrive at the present fair value of the property for the purpose of fixing rates, it is proper to take into consideration and to deduct actual existing depreciation. We quote from the brief, page 181:

"We have already pointed out (citing numerous cases) that the law requires that the actual existing depreciation must be determined and must be deducted from reproduction cost new. No other kind of depreciation is deductible, regardless of the difficulty involved in ascertaining the actual existing depreciation."

And again counsel say in their brief at page 192:

"The Company is entitled to earn a fair return on the actual fair value of its property. Manifestly, if some figure other than existing depreciation is deducted, present fair value is not obtained."

In Los Angeles Gas & Electric Corporation v. Railroad Commission, supra, the court said:

"In determining present value, deduction must be made for accrued depreciation." Citing City of Knoxville v. Knoxville Water Co., 212 U.S. 1, 10, 29 S.Ct. 148, 53 L.Ed. 371; Minnesota Rate Cases, 230 U.S. 352, 457, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.(N.S.) 1151, Ann.Cas. 1916A, 18.

In the Minnesota Rate Cases, supra, 230 U.S. 352, 33 S.Ct. 729, 754, 57 L.Ed. 1511, 48 L.R.A.(N.S.) 1151, Ann.Cas.1916A, 18,

the court said in speaking of the proper rate base:

"The basis of calculation is the 'fair value of the property' used for the convenience of the public. Smyth v. Ames, 169 U.S. [466] 546, 18 S.Ct. 418, 42 L. Ed. [819] 849. Or, as it was put in San Diego Land & Town Co. v. National City, 174 U.S. [739] 757, 19 S.Ct. 804, 43 L.Ed. [1154] 1161: 'What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public.'"

And the court quoted with approval the following from the case of Smyth v. Ames:

"On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth." Quoted on page 755 of 33 S.Ct.

So that the controversy between the Commission and the Company on this particular point is not whether accrued depreciation should be deducted in order to ascertain present fair value, but whether the Commission deducted the correct amount. The Company conceded that it would have been proper to deduct the sum of $3,891,700 for depreciation, which is $3,539,615 less than was deducted.

The Company arrived at its figure by using Hill's estimate of the percentage of depreciation of the property as a whole, which he said was 11.5 per cent. The Commission thought the property had depreciated in value at least 22 per cent., and possibly 23 per cent. The difference in these percentages accounts for the difference between the amount deducted and the amount which the Company - says should have been deducted. The Company's chief complaint is that the Commission acted arbitrarily in fixing the amount of depreciation—that its conclusions find no support in the record.

It is said that the Commission made no examination of the Company's property to serve as a basis for its appraisal and valuation. That is true in part only, as we shall presently show. It is said also that the Company's estimate of values and depreciation was based upon an examination of the physical property made by its chief engineer, Hill, and his corps of assistants, and should therefore have more weight than that of the Commission. While the record shows that the witnesses for the Company made a more extensive examination and inspection of the property than did the witnesses for the Commission, it is not true that the Company's witnesses made a complete examination, nor is it true that the Commission's witnesses made none. Neither side pretends its witnesses made a complete, minute inspection and appraisal of all the component parts of this utility plant. That was not to be expected. In cases of this kind, the value of the property and the amount of depreciation necessarily involve estimates and sound judgment. The estimates should, of course, have some basis, some foundation to support them, and not be purely arbitrary. In the very nature of things, it is wholly impracticable, if

not impossible, in cases of this kind, for either side to make a complete, minute inspection and appraisal of all the constituent parts which make up a vast, composite telephone system, nor can the exact value of such a plant be determined. The plant is not a commercial product and has no market value. Its original cost may be ascertained by an inspection of the Company's books, and its reproduction cost new may be estimated. But neither the original nor the estimated reproduction cost of the plant is to be used as the present fair value of the property. To say that the Legislature in order to establish proper rates and charges in cases like this must first make a complete inspection, inventory, and appraisement would be almost tantamount to saying that rates and charges once established could never be changed, because the time and expense involved for such purpose would be prohibitive.

The argument that the Commission adopted a purely arbitrary and unauthorized method of ascertaining the amount of depreciation which the Company's property has undergone is not supported by the record. For that purpose it employed experts, among them being Mr. H. W. Abbett, an engineer who graduated at Purdue University in 1916, went with the Indiana Public Service Commission in 1919 and stayed with it until 1934. He was engineer on the staff making appraisals and reports for that Commission and had made appraisals of the properties of the public utility corporations in that state, including telephone companies. He was asked if he had examined "some of the property" of the Company in Louisiana, and said:

"Yes, in various parts of the State, I examined several of the exchanges, almost all their exchanges in New Orleans and in Shreveport, Alexandria and Baton Rouge." (Record, p. 2032.)

He exhibited and explained a statement which he had made up, based, he said, partly on his examination of this property, partly on his experience gained in other similar cases, and partly on figures shown by the Company's books. This statement, found at page 2369 of the Record as "Abbett Exhibit A," is made out in detail, showing the admitted original cost of each and every item of property, such as lands, rights of way, buildings, central office equipment both manual and dial, station apparatus and installation, drop and block wires, etc., which entered into the plant as a whole. It shows further the estimated percent rate of depreciation, the average age in years, the percentage of accrued depreciation, and the amount in dollars of the estimated accrued depreciation of each and every item of the property. According to his estimate, the existing depreciation amounts to $7,-669,455.81, or approximately 22 per cent., or $283,140 more than the Commission deducted from the estimated cost of reproducing the plant new.

Mr. Hill, the Company's engineer, used practically the same methods in arriving at the amount in dollars of the existing depreciation, but reached a different conclusion. He thought that not more than $3,891,700 should be deducted, but conceded that much.

The Commission, after hearing the testimony and examining the exhibits presented by these expert engineers and the testimony and exhibits of auditors and accountants for both sides, reached the conclusion that Abbett's estimate more nearly reflected the present existing depreciation than did Hill's, and accepted it.

It is physically impossible for us to collate and analyze the figures in this voluminous record. In fact, it is not our function to do so. But an examination of some of the tables filed by Mr. Hill has led us to the conclusion that the estimates of depreciation made by him for rate-making purposes are not fair to the rate payers. For instance, he shows that the Company owns several central office buildings in the state. The Franklin dial office was erected in 1926 at a cost of $122,042.34. The building was therefore nearly eight years old at the time of his estimate, and while the Company set up on its books for depreciation reserve purposes an annual depreciation rate of 2.1 per cent., he estimated that the building had in its life of eight years depreciated only $6,293.35, or 5.16 per cent. The main office building in New Orleans was erected in 1916–17 at a cost of $627,585.80, and while the Company had set up on its books an annual depreciation rate of 2.1 per cent. it had during its life of nearly seventeen years depreciated only $59,825.-45, or 9.53 per cent., or approximately 0.6 per cent. per annum.

The building at Shreveport was erected in 1925–26 at a cost of $323,148.65. An annual book depreciation of 2.1 per cent. was set for it, but after eight years Mr. Hill found that it had depreciated only $13,539.25, or 4.19 per cent.

By multiplying the annual depreciation rate of 2.1 per cent. set up on its books by the Company for each of these buildings by its age, it would appear that there should have been found a total depreciation of approximately 16.8 per cent. on the Franklin building, 34.86 per cent. in the main building in New Orleans, and 17.64 per cent. in the Shreveport building, instead of 5.16 per cent., 9.53 per cent., and 4.19 per cent., respectively, as found by Hill.

These and other wide discrepancies between the percentage of annual depreciation set up by the Company on its books for the establishment of a depreciation reserve and the observed depreciation in the Company's property as a whole found by its witnesses brought forth the following comment by the Commission (on page 19 of its order No. 1530):

"In connection with the discussion of the subject of accrued depreciation above, it was stated that the company's present annual charge for depreciation purposes is 4.64 per cent., which is applied to the book cost of the depreciable property, and it was pointed out that in making such charge the company is attempting to provide for inadequacy of plant when, as a matter of fact, there is instead a large surplus of facilities."

Pages 21, 22: "The excessive character of the company's depreciation charges in recent years is indicated by the fact that in the past four years the amount taken out of revenues and credited to the re-

serve exceeded the charges against the reserve for retirements by approximately $1,000,000 a year. In other words, the company's patrons have been called upon in these days of economic distress to furnish $1,000,000 annually in excess of what the company has actually expended in making good the depreciation in its property."

Page 23: "The Commission does not take the extreme view that the entire amount of this million-dollar difference between the credits and charges to the reserve should be made available for rate reductions, but it finds that under existing conditions the company's annual charge for depreciation is grossly excessive and that a proper charge at present should be based approximately upon the physical lives of the various elements of the property. An allowance on this basis was testified to by Mr. Abbett, resulting in a composite rate of 3.14 per cent., and the Commission believes this a liberal charge to operating expenses at the present time."

In order to arrive at the present fair value of the Company's property useful and used in the production of service, the Commission took into consideration (1) the original or book cost, and (2) the estimated reproduction cost new. In each instance it made deductions for depreciation. In arriving at the proper amount of deduction, it considered the testimony of the experts, both engineers and accountants, and reached the conclusion that engineer Abbett's estimate was approximately correct, although it deducted slightly less than his tables showed.

The methods used by Abbett seem to be in line with those prescribed by the Interstate Commerce Commission and those approved by the United States Supreme Court in the leading cases. Hence it cannot be said, we think, that the Commission acted arbitrarily or used improper methods.

It does not appear that the Commission ignored or failed to consider the testimony adduced by the Company. On the contrary, it considered all the testimony. As to whether it should accept the estimates made by Abbett, its own engineer, rather than that of the Company's engineer, Hill, was a matter within its own sound discretion.

We think it had reason to regard as unreasonable estimates made by some of the Company's witnesses. As one instance, Hill's estimates of depreciation on the buildings to which we have already referred. Another, Mr. Woodruff's "over all" estimate of the present fair value of the plant. He gave it as his opinion that the present value of all the property in the state at the time the case was presented was $34,000,000, and of that used in intrastate business, $31,000,000. He said that in arriving at this conclusion he had taken into consideration all the factors entering into a proper estimate of present fair value, including depreciation. Considering the fact that his estimate exceeded not only the original cost but the estimated cost of reproducing the property new, and the further fact that it exceeded by nearly $15,000,000 the sworn valuation placed by the Company for taxation purposes; and the further fact (of

which the Commission was warranted in taking official notice) that during the so-called depression period, the value of all property slumped enormously from that which prevailed in the peak years, it is not surprising that the Commission was not favorably impressed with the Company's estimates.

The Commission made a further deduction of $3,044,075, or 12.5 per cent., for excess plant or facilities not in use. That there was a margin between plant capacity and plant in use at the time this investigation was made and the order issued, of considerably more than double the percentage deducted is well established by the testimony. During the peak or boom years from 1919 to 1927, the Company greatly enlarged its plant facilities in response to increased public demands and demands made by the chairman of the Public Service Commission. There were times during those years when the Company could not furnish all the telephones requested. Since there were greater needs, the Company furnished greater facilities, and it is in evidence that by the end of 1928, the Company had so enlarged and broadened its plant that its capacity for service exceeded the demands by approximately 12.5 per cent. In other words, due to this enlargement it had, at the end of 1928, "excess plant facilities" not in use of about 12.5 per cent. This excess was to take care of anticipated future needs. In commenting on this situation, counsel for the Company say in their brief (page 120):

"There is no evidence that the Company has planned and laid out its properties to meet its needs in the future in an unreasonable manner or that any of its expenditures in that behalf are unreasonable or beyond what a prudent business man would do under like circumstances. There is no evidence of bad faith, waste, negligence, or improper judgment."

"Public service companies cannot wait until their facilities break down or prove unequal to the demands upon them before making the needful additions and improvements. Business judgment must be employed to anticipate reasonable future needs and to make provision for them in advance. To do otherwise would be short-sighted, wasteful, and uneconomical, and would, in the long run, entail heavier charges upon the subscribers and at the same time would deprive them, temporarily, at least, of the additional facilities due to the delays necessary for the installation of the additional equipment required."

Page 124: "There is no contention that the existing margin in 1930, prior to the depression, was too great and, as a matter of fact, the Commission in its opinion admitted that the margin of 12½% in 1930 was reasonable. (Commission opinion, pp. 23-29, R. 2310.) It has never been contended that at that time the Company had provided more facilities than were reasonably necessary to permit it to discharge its obligation."

Counsel have correctly stated the facts and no fault can be found with their argument, which, in sum, they state in the

following language, which we quote from page 117 of their brief:

"The Company, as a public service corporation, is legally obligated to furnish adequate service on demand and to do this must necessarily make the provision for adequate facilities in advance of the demand."

The position taken is amply supported by authority. Reasonable excess or overbuilding is not to be condemned, nor has it ever been so far as we know. It is in keeping with sound business methods. The court in the case of Southern Bell Telephone & Telegraph Co. v. Railroad Commission of South Carolina (D.C.) 5 F.(2d) 77, 94, well said:

"The defendants claim that the value of the additional equipment so provided for future use should not be included in the present value on which remuneration should be allowed, on the ground that it is idle capital. But such equipment is not idle capital in the proper sense of the term. A business concern, and especially a telephone company, must look to the future as well as the present. It is the part of wisdom to forecast the growth of communities they serve and be prepared to meet new conditions as they arise."

Counsel in their brief repeatedly hark back to the conditions and necessities which prevailed at the time of this overbuilding. But they blink these facts established by the record: (1) That these excess plant facilities were provided during the state's greatest era of prosperity and development; and (2) that immediately following that era this state, like all others, suffered incalculably from the effects of an economic depression the like of which this generation had not seen; and that (3) from the peak period up to the end of 1934, this Company, in common with all other business enterprises, had not only been unable to hold that which it previously had, but had lost business to an alarming extent. The number of its subscribers and patrons dwindled constantly and greatly, the decline approximating 18 per cent. Adding this percentage of decline to the percentage of margin (12.5 per cent.) which the Company had before the beginning of the depression period, it would appear that at the time the Commission's order was issued there was an excess margin of facilities of about 30 per cent.

The experts on both sides thought, and the Commission conceded, that there would be considerable growth in business from the end of 1934 to the end of 1936. But none of the witnesses estimated that the growth would be sufficient to absorb anything like the 18 per cent. of loss during the depression. This loss may and, in time, probably will be recouped. If and when it is, the Company will still have the 12.5 per cent. margin of excess which it provided during the boom period.

Now the question is whether the rate payers should be called upon to make good the Company's losses due to these unforeseen conditions. The answer is found in the common-sense proposition that investors in public utility corporations, the stockholders, have no right to expect the public to underwrite their investments. When the value of the property in which

they invest slumps due to abnormal economic conditions, they must take losses along with investors in other kinds of property. They must endure the common fate of all. As the court said in the West Case, supra, "The public should not be bound to allow a return measured by investment." See Los Angeles Gas Corporation v. Railroad Commission, supra.

Due to bad business conditions, a large percentage of the Company's property, in addition to the 12.5 per cent. margin originally provided, was idle when the order was issued. The deduction for excess plant had reference to that percentage of the property left idle on account of the conditions named. We think the deduction was warranted under the rulings in the following cases: Smyth v. Ames, supra; San Diego Land & Town Co. v. National City, 174 U.S. 739, 19 S.Ct. 804, 43 L.Ed. 1154; San Diego Land & Town Co. v. Jasper, 189 U.S. 439, 23 S.Ct. 571, 47 L.Ed. 892; Willcox v. Consol. Gas Co., 212 U.S. 19, 29 S.Ct. 192, 53 L.Ed. 382, 48 L.R.A.(N.S.) 1134, 15 Ann.Cas. 1034; Minnesota Rate Cases, supra; Kansas City Southern Ry. Co. v. United States, 231 U.S. 423, 34 S.Ct. 125, 58 L. Ed. 296, 52 L.R.A.(N.S.) 1; United Fuel Gas Co. v. Public Service Comm., 278 U. S. 322, 49 S.Ct. 157, 73 L.Ed. 402; and Columbus Gas & Fuel Co. v. Public Utilities Comm., 292 U.S. 398, 54 S.Ct. 763, 78 L.Ed. 1327, 91 A.L.R. 1403.

The Company's next complaint is that in considering the estimates of the reproduction cost new of the plant, the Commission allowed an insufficient amount for working capital. The amount allowed was about $100,000, whereas the Company claims it should have been allowed about $355,000. The Commission's reasons for allowing no more than it did are set out in detail and at some length in its report. Its conclusion was based upon facts which we shall not review. It suffices to say that it heard testimony touching the point, and its findings seem reasonable.

The Commission found that the fair value of the Company's property was $21,500,000. This is $2,292,790 more than the Company's tax commissioner, Mr. Edward Lyle valued the property for taxing purposes on April 1, 1934. On that date he submitted to the Louisiana Tax Commission a detailed, itemized statement of all the property owned by the Company in Louisiana, and in a column headed "Actual value" showed his appraisal in dollars of each class or kind of property, such as miles of pole lines, miles of copper wire, miles of iron wire, central office equipment, real estate and improvements, all other personal property, etc. The sum total of the values listed is $19,207,210. Attached to this statement and appraisal is his affidavit that the "foregoing report of Southern Bell Telephone and Telegraph Company, Incorporated, is true and correct and that the values placed on all items represent the actual cash value thereof as of December 31, 19——."

This report was submitted to serve as a basis for taxation for the year 1933. Counsel for the Company, in their reply brief, say that the value of the property at the end of 1933 has no bearing on the

question of its value at the end of 1934, when the investigation was made. It is not conclusive on that point, but it does have some bearing. That report was filed in evidence at the hearing and counsel knew that it was filed for a purpose. If, as a matter of fact, the property had enhanced in value between the end of 1933 and the end of 1934, the burden was upon the Company to show it. No such proof was made.

Counsel argue that this report should not be considered as evidence, and in support of their argument cite three cases decided by this court: Rapides Grocery Co. v. Grant, 174. La. 1083, 142 So. 696; Louisiana Highway Comm. v. Guidry, 176 La. 389, 146 So. 1; and Peavy-Wilson Lumber Co. v. Jackson, 161 La. 669, 109 So. 351.

In the Rapides Grocery Co. Case we said that evidence of the amount at which a stock of merchandise was assessed for taxation proved nothing as regards its actual cash value. The Guidry Case involved the expropriation of land for a right of way for a public road, and we said it was a matter of common knowledge that real property in this state was not assessed at its actual cash or market value. But we said, and this is important:

"The assessed value may be considered as a factor in determining the true value, but it is not controlling." 176 La. 389, at page 404, 146 So. 1, 5.

In the earlier case of Peavy-Wilson Lumber Co. v. Jackson, the court in speaking of the reports required by law to be made by all corporations other than public service corporations, said (161 La. 669, at page 673, 109 So. 351, 352):

"It is clear that such reports are not intended as the basis of individual assessment, but for comparison, in order to arrive at an average fair value of the plants and products of such corporations."·

These cases do not support counsel's argument that sworn reports made by property owners as to the value of their property are not to be considered along with other factors in determining true value of property.

In rate making cases, federal courts have held, more than once, that sworn statements of value by public utility corporations are admissible and may be considered. In San Diego Land Co. v. Jasper, supra, the United States Supreme Court held, to quote paragraph 3 of the syllabus, which is a correct statement of the ruling on this point:

"The valuation of a water works plant for purposes of taxation may be considered by the courts in determining the reasonableness of water rates as fixed by a board of supervisors,—especially where such valuation was sworn to by officers of the water company."

In Great Falls Gas Co. v. Public Service Comm. (D.C.) 34 F.(2d) 297, 299, the court said that such reports "were properly received in evidence as admissions against interest." Citing the San Diego Case, supra. To the same effect is the case of Fort Worth Gas Co. v. Fort Worth (D.C.) 35 F.(2d) 743.

In the case of Adams Express Co. v. Ohio State Auditor, 166 U.S. 185, 186, 17

S.Ct. 604, at page 606, 41 L.Ed. 965, the court said:

"Now, it is a cardinal rule, which should never be forgotten, that whatever property is worth for the purposes of income and sale it is also worth for purposes of taxation."

The value of the Company's property sworn to by Mr. Lyle is not controlling. But it has evidentiary value in cases of this kind. It should be and was considered by the Commission in determining present fair value. It certainly is relevant in considering the weight to be given the testimony of other employees of the Company. The discrepancy between Mr. Lyle's sworn valuation of the property, which he placed at $19,207,210 for taxation purposes and the valuations found by Woodruff and Hill for rate-making purposes, is too glaring to be overlooked.

We do not find that the Commission used unauthorized or unfair methods in arriving at the present fair value of the Company's property or that it refused or failed to consider the testimony offered by it. In the last analysis and in sum, the Company's complaint is that the rates fixed by the Commission are confiscatory. That being its complaint and the main issue, the burden was upon it to establish that fact. In our opinion, it has failed to discharge that burden.

The Commission said in its order that the Company was entitled to a return of 6 per cent. According to its calculations, the rates fixed will enable the Company to realize at least that. But counsel say that if, by meticulous calculations, it can be shown (and they claim they have shown) that the return will be even the smallest fractional part of 1 per cent. less than 6 per cent., the rates are confiscatory. In other words, if the returns amount to the smallest fraction less than the Commission said the Company was entitled to earn, the order must be set aside as illegal.

The question presented in this case is not what the Commission thought the Company should receive as a return on its investment, but whether the rates fixed are confiscatory. It cannot reasonably be said that if the returns under the rates fixed will fall slightly under 6 per cent., say to 5.95 per cent., 5.5 per cent., or even 5 per cent., the Commission's order will result in confiscation, and that is the test. It is a matter of such common knowledge that we take judicial notice of it that interest rates are extremely low, lower than ever known in this country. Fortunate indeed is the investor who can realize as much as 5 per cent. on good investments, and many are satisfied with 3½ per cent.

In the case of Alexandria Water Co. v. City Council of Alexandria, 163 Va. 512, 177 S.E. 454, 495, decided in the latter part of 1934, the court disregarded the suggestion and argument here made, saying:

"But we are not here concerned with what the commission in the exercise of its legislative discretion deems a fair and reasonable return. Upon a judicial review, we are concerned only with this ultimate question, Are the rates prescribed confiscatory?"

 The Company complains of the refusal of the Commission to allow its claim for "going concern value." This claim was presented for consideration at the hearing. It was not allowed and is not discussed in the report.

By "going value" or "going concern value" is meant a value or asset which arises from having an established or going business.

In rate-making cases, the paramount question is whether the rates fixed will result in the confiscation of the public utility's property, and whether going concern value should be regarded as a distinct element of value in fixing rates depends upon circumstances. In our opinion this is not a case where going value should be allowed.

The Company claims that it should be allowed more than $3,000,000 under this heading. This claim is made for "Cost of making Going Concern with organized forces and attached business," Hill's Exhibit, page 1777 of the record. Under this heading are included such items as cost of organization, training of employees, planning and preparation of records, maintenance of plant in advance of beginning service, getting subscribers, interest on investment prior to getting started, salaries paid officers and employees prior to getting started, and the like.

As relating to this claim, it is pertinent to observe that this is not a new plant, but was completed as a going concern years ago, and that every item of expense listed has long since been paid by the rate payers. The Company has always taken from the amounts collected sums sufficient to take care of operating expenses and to take care of the expenses of organization. The amount claimed is reflected in other items carried on the books of the Company. There is nothing to justify a holding that the claim of going concern value should have been considered by the Commission as an item of property separate from the appraisal of the plant as an assembled whole. There was never any burden of building up patronage. The Company had no competition. Subscribers or patrons were ready and waiting for service when the plant was completed, and there were times later when the Company could not supply the demands. Its employees are trained in the every day routine of business; the planning and preparation of records is a completed task, and, as we have said, the expense for all this has been taken care of out of operating expenses which the rate payers have contributed. We think this intangible item of "going concern value" has been taken care of in the cost of operating expenses and that it was properly disallowed.

See the case of Los Angeles Gas & Electric Corporation v. Railroad Commission, supra, where practically all the cases on the subject are cited and reviewed.

Columbus Gas & Fuel Co. v. Public Utilities Commission, 292 U.S. 398, 54 S. Ct. 763, 78 L.Ed. 1327, 91 A.L.R. 1403.

 Rate making is a legislative and not a judicial function. The function of the court is to see that constitutional

limitations are not transgressed by the rate-making body. We do not think they have been in this case.

The language used by Chief Justice Hughes in the Lindheimer Case (Lindheimer v. Illinois Bell Tel. Co.), 292 U. S. 151, 54 S.Ct. 658, at page 668, 78 L.Ed. 1182, is applicable here:

"It is not the function of the court to attempt to construct out of this voluminous record independent calculations to invalidate the challenged rates. It is enough that the rates have been established by competent authority and that their invalidity has not been satisfactorily proved."

For the reasons assigned, the judgment of the district court is reversed and set aside, and it is now ordered that the Louisiana Public Service Commission's order No. 1530, made and dated March 2, 1935, be reinstated and made effective from its date.