## COLUMBUS GAS & FUEL CO. *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL.

No. 937.   Argued May 1, 2, 1934.—Decided May 21, 1934.

*Mr. Edward C. Turner,* with whom *Mr. Albert M. Calland* was on the brief, for appellant.

*Messrs. John L. Davies* and *James W. Huffman* for appellees.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

An ordinance of the City of Columbus, Ohio, approved by the electors at a referendum vote, provides that for five years from November 12, 1929, the price to be charged for natural gas shall be ,at the rate of 48 cents per thousand cubic feet with a minimum charge of 75 cents per month.

The appellant, the Columbus Gas & Fuel Company, supplies gas to consumers in the City of Columbus, purchasing the gas from the Ohio Fuel Gas Company, an

affiliated corporation. Part of the gas so supplied is produced by the Ohio Fuel Gas Company in its own gas fields, part is bought by it from another affiliated corporation, the United Fuel Gas Company, and part from independent producers. The three affiliated corporations, i.e., the appellant, the Ohio, and the United, are subsidiaries of one parent company, the Columbia Gas & Electric Corporation.

On December 31, 1929, the Columbus Gas & Fuel Company filed a complaint with the Public Utilities Commission of Ohio in which it prayed that the rate prescribed by the ordinance be declared to be inadequate and that such other rate be substituted as might be found to be just and reasonable. To dispose of that complaint there was need of an inquiry into the value of the complainant's property and into its operating expenses, which in turn necessitated an inquiry into the property and expenses of its affiliated corporations. Until some time in 1929, there had been a contract between the Columbus Company and the Ohio Fuel Gas Company whereby for gas delivered at the city gateway Columbus was to pay to Ohio 65% of the local retail rate, retaining 35% for itself as distributor. On the basis of a 48 cent retail rate, the gate rate would thus have amounted to 31.2 cents, and 16.8 cents would have been the return to the distributor. By consent, this agreement was canceled in 1929, and a gate rate of 45 cents was substituted. Most of this voluminous record grows out of a controversy as to the fairness of that charge. The Columbus Company and the Ohio being parts of a single affiliated system, their intercorporate agreement does not control the price to be paid by consumers if the rate thereby established is higher than a fair return. *Dayton Power & Light Co.* v. *Public Utilities Comm'n of Ohio, ante,* p. 290. The process of ascertaining that return did not end with an inquiry into the property and expenses of the affiliated seller.

It became necessary to examine the property and expenses of a second affiliated company, the United Fuel Gas Company, which produces gas in West Virginia and sells to the Ohio Company, delivery being made at the Ohio River. The price charged for this gas, which was afterwards mingled with the gas from other fields, is known as the "river rate," and is so described in the record. What was fairly due from Columbus for gas delivered at the gateway is not susceptible of ascertainment without tracing the supply to its sources far away.

The Commission followed these inquiries through all their elusive ramifications. Its members were in agreement as to the value of the appellant's property to be included in the base. They were also substantially in agreement as to all the items of operating expenses with the exception of the price to be paid to the affiliated seller. If that item was laid aside, a rate of 16 cents plus per thousand cubic feet would assure to the appellant the enjoyment of a fair return. Division of opinion came in estimating the price at the gateway and the river. As to that item of expense a majority held the view that a fair price to be paid to the affiliated seller was 39.02 cents per thousand cubic feet, which, added to a rate of 16.02 cents to be retained for distribution, would make the retail price in Columbus 55.04 cents, or 7.02 cents in excess of the rate established by the ordinance. A minority opinion fixed the price at the gateway at 31.70 cents per thousand cubic feet, and the total retail price at 47.95 cents. An order was made, in accordance with the report of the majority, whereby the ordinance rate of 48 cents was declared to be inadequate, and a rate of 55 cents, with an additional charge of 5 cents per thousand cubic feet if monthly bills were not paid within a fixed time, and a monthly minimum charge of 75 cents without discount, became a substituted schedule.

Cross-appeals followed to the Supreme Court of Ohio. The City of Columbus, which had intervened in the proceeding, appealed upon the ground that the ordinance rate should have been upheld as adopted by the city and approved by the electors. The Columbus Gas & Fuel Company appealed upon the ground that the substituted schedule was too low, and that nothing less than 69.59 cents per thousand cubic feet would yield a fair return. United States Constitution, Amendment XIV. The Supreme Court of Ohio held in favor of the city, adopting for the most part the conclusions of the minority commissioner, though going in some respects beyond them. It held that an adequate price at the gateway would be 31.70 cents or less. In arriving at that conclusion it set aside the finding of the Commission that the operating expenses of the affiliated seller should include a yearly allowance of $4,158,954, to amortize the depletion of the gas fields and appurtenant equipment. It held also that the "river price" paid by the Ohio Company to the United, which had been fixed by the majority commissioners at 22 cents, was too high to the extent of 4.21 cents, thus reducing that item to 17.79 cents per thousand cubic feet. Going farther, it held that all the members of the Commission had erred in appraising the gas fields known as class No. 1 [1] at $25 an acre, and that the valuation of the leases should have been made on the basis of book cost, excluding all leases acquired as a reserve and not presently in use. Cf. *Dayton Power & Light Co.* v. *Public Utilities Comm'n of Ohio, supra.* It held also that in fixing the price of gas delivered at the gateway there should have been an additional reduction that would make appropriate allowance for the lower cost of transmission to Columbus as compared with points more distant, though the opinion does not furnish us with any workable formula whereby to put the precept into force.

[1] This classification is explained in *Dayton Power & Light Co.* v. *Public Utilities Comm'n of Ohio, supra.*

As the upshot of the whole matter, the court arrived at the conclusion that the ordinance rate was valid, and remanded the proceeding. 127 Ohio St. 109; 187 N.E. 7. There was an appeal to this court, which was dismissed upon the ground that the order was not final. 291 U.S. 651. Thereupon the Supreme Court of Ohio amended its decree by striking out the remand, and substituting a direction that the rate be established in accordance with the ordinance. Upon an appeal from the decree as thus amended the cause is here again.

Many of the questions urged on this appeal have been considered very recently by this court in disposing of an appeal by an affiliated company. *Dayton Power & Light Co.* v. *Public Utilities Comm'n of Ohio, ante,* p. 290. In so far as the cases overlap, we refer to that opinion without repetition of its reasoning. But along with many features of identity there are important points of difference. The issue in the *Dayton* case was one as to the right of the gas company to put into effect a new schedule higher than the rate level previously prevailing. The issue in this case is one as to the right of the municipality to establish a new schedule lower than any level accepted by the company. All that the state court had to do in order to uphold the determination in the *Dayton* case was to reach the conclusion that adherence to the old rates would not result in confiscation. What it said as to the possibility of excluding an amortization allowance and several other contested items did not determine the result. "If the evidence would have been adequate to uphold a lower rate, *a fortiori* it was adequate to uphold the rate prescribed." *Dayton Power & Light Co.* v. *Public Utilities Comm'n of Ohio, supra.* Here, on the other hand, the decision of the state court reverses the determination of the Commission, and in so doing excludes important items, such as an amortization charge and others, which had received allowance there. Not a little that was put aside in the *Dayton* case as unrelated to the re-

sult must have consideration and decision now. To those items we turn first, postponing for the moment what will have to be said later as to items less contentious.

■ Amortization, depletion and unoperated leases.

We have seen in the *Dayton* case that in determining the price to be paid for gas delivered at the gateway, the Commission included among the operating expenses of the affiliated seller an annual allowance of $4,158,954, to amortize the value of leaseholds No. 1 (the only leaseholds then in use) and of the well-structures and equipment used in connection therewith, and thus provide a fund that would restore the depleted capital when the gas had been exhausted. The same allowance was made here.

Upon the appeal by the City of Columbus to the Supreme Court of Ohio the item thus allowed was excluded altogether. The court did not deny that without the creation of a fund to replenish wasting assets the affiliated seller would be left with only a salvage value for leases, wells and fittings after the exhaustion of the gas. It put its judgment upon the ground that the statute of Ohio defining the powers of the Commission and the method of appraisal makes no provision for depletion (Ohio General Code, §§ 499–9 to 499–13), and that the statute, and nothing else, gives the applicable rule. We may assume in submission to the holding of that court that the amortization allowance must be rejected if the rate making process is to conform to the rule prescribed by statute, irrespective of any other. That assumption being made, the conclusion does not follow that the statutory procedure may set at naught restrictions imposed upon the states and upon all their governmental organs by the constitution of the nation.

To withhold from a public utility the privilege of including a depletion allowance among its operating expenses, while confining it to a return of 6½% upon the value of its wasting assets, is to take its property away

from it without due process of law, at least where the waste is inevitable and rapid. The Commission has found that the life expectancy of the operated gas fields is only three years and two months. If that holding is correct, the owner of the exhausted fields will find itself in a brief time with wells and leases that are worthless and with no opportunity in the interval to protect itself against the impending danger of exhaustion. Plainly the state must either surrender the power to limit the return or else concede to the business a compensating privilege to preserve its capital intact. *Knoxville* v. *Knoxville Water Co.*, 212 U.S. 1, 13; cf. *Helvering* v. *Falk*, 291 U.S. 183. There is nothing to the contrary of this in cases such as *Burnet* v. *Harmel*, 287 U.S. 103, 107, 108; *Stratton's Independence, Ltd.* v. *Howbert*, 231 U.S. 399; and *Goldfield Consolidated Mines Co.* v. *Scott*, 247 U.S. 126. The profits of a mine may be treated as income rather than as capital if the state chooses so to classify them and to tax them on that basis. This is far from saying that in the process of rate making depletion of the capital may be disregarded by the agencies of government in figuring the interest returned on the investment. " Before coming to the question of profit at all the company is entitled to earn a sufficient sum annually to provide not only for current repairs but for making good the depreciation and replacing the parts of the property when they come to the end of their life." *Knoxville* v. *Knoxville Water Co.*, *supra; Lindheimer* v. *Illinois Bell Telephone Co.*, *ante*, p. 151. It is idle to argue that a company using up its capital in the operations of the year will have received the same return as one that at the end of the year has its capital intact and interest besides.

We hold that a fair price for gas delivered at the gateway includes a reasonable allowance for the depletion of the operated gas fields and the concomitant depreciation of the wells and their equipment. What that allowance shall be has not yet been considered by the

Supreme Court of Ohio, invested with jurisdiction to review the law and facts. *Hocking Valley Ry. Co.* v. *Public Utilities Comm'n,* 100 Ohio St. 321, 326; 126 N.E. 397. The court will have to say in the light of all the circumstances whether the amount to be allowed shall be the same as that fixed by the Commission ($4,158,954), or something less or greater. It may disagree with the Commission either as to the value of the fields or as to the life expectancy of the supply of gas. There will be power, we assume, to direct another hearing if the basis for an intelligent judgment is lacking in the record. When the allowance has been fixed and has been charged to operating expenses, it will supply the answer to other questions in controversy now. There will be no need, when that is done, to include in operating expenses a separate provision for the payment of " delay rentals " upon leases in reserve. This is so for reasons that were explained in the *Dayton* case. " Operating expenses are magnified unduly if they cover both the fund and the payments that are made out of it.". *Dayton Power & Light Co.* v. *Public Utilities Comm'n of Ohio, supra.* There will be no need in the computation of the rate base to include the market or the book value of fields not presently in use, unless the time for using them is so near that they may be said, at least by analogy, to have the quality of working capital. The arrival of that time cannot be known in advance through the application of a formula, but within the margin of a fair discretion must be determined for every producer by the triers of the facts in the light of all the circumstances.[2] The burden is on the gas company to supply whatever testimony

---

[2] The state court will be in a position to determine the unoperated acreage analogous to working capital when it has ascertained the life expectancy of present sources of supply.

If there is a change in the allowance for annual depreciation, there may be need for a corresponding change in accrued depreciation.

may be necessary to enable court or board to make the requisite division. Leases bought with income, the proceeds of the sale of gas, and thus paid for in last analysis through the contributions of consumers, ought not in fairness to be capitalized until present or imminent need for use as sources of supply shall have brought them into the base upon which profits must be earned. To capitalize them sooner is to build the rate structure of the business upon assets held in idleness to abide the uses of the future. At times the immediate purpose of buying up extensive tracts is to forestall or stifle competition that might bring the prices down. There is adequate compensation for investment so remotely beneficial when the cost of renewing fields in present operation, and thus replenishing the capital, is paid out of gross earnings as an expense of operation, with a proportionate increase of the prices to be charged for gas thereafter. Cf. *Natural Gas Co.* v. *Public Service Comm'n,* 95 W.Va. 557, 569, 570; 121 S.E. 716; *United Fuel Gas Co.* v. *Public Service Comm'n,* 14 F. (2d) 209, 221; *Erie City* v. *Public Service Comm'n,* 278 Pa. 512, 531; 123 Atl. 471. Postponement of other profit until the stage of imminent or present use is not an act of confiscation, but a legitimate exercise of legislative judgment. Certainly that is so when the amortization fund has been computed with reasonable liberality, and is large enough to make provision for adequate reserves. If the company is not satisfied to have the depletion allowance thus applied in renewal of its life, it may divide the fund among the stockholders and wind the business up. It cannot get its capital back at the expense of the consuming public and also at the same expense provide itself with a fresh supply to keep the business going.

■ The River Rate.

We have seen that the Ohio Company when buying gas from the United Company, an affiliated corporation,

paid an agreed rate (26½ cents per thousand cubic feet) for delivery at the river.

A majority of the Ohio Commission, following in substance a decision of the Commission for West Virginia, fixed the reasonable price for gas so delivered at 22 cents per thousand cubic feet, and computed operating expenses accordingly.

The West Virginia Commission with the approval of the Supreme Court of that state (*Charleston* v. *Public Service Comm'n*, 110 W.Va. 245; 159 S.E. 38) had permitted an annual depreciation allowance of 1.12% and a depletion or amortization allowance of 4.15%.

The Supreme Court of Ohio struck out these allowances, thereby reducing the rate payable at the river from 22 cents to 17.79 cents. In so doing it adhered to the ruling, announced elsewhere in the same opinion, that under the statutes of Ohio amortization is not permissible to replenish wasting assets. For reasons already stated these items should be restored with such modification in amount as may be found to be appropriate upon a survey of the evidence.

The claim is made by the appellant that the river price remains inadequate after adding the excluded items for depreciation and depletion, and that the price should be fixed in accordance with the contract. There is nothing to show that the Supreme Court of Ohio held itself bound by the determination of the West Virginia Commission, or failed to exercise an independent judgment upon the evidence before it. The testimony and exhibits in West Virginia had been read into the record. We must presume they were considered. Nothing now before us justifies a finding that they fail, with the exceptions already noted, to sustain what has been done.

■ Allocation.

Upon the hearings before the Commission, the city made the claim that in the appraisal of the property of

the Ohio Fuel Gas Company, the production property should be allocated between Columbus and other municipalities upon the basis of the sales, but the transmission property should be allocated upon the basis of mileage, multiplied by the peak demand at the place of distribution. In opposition the appellant contended that allocation on the basis of mileage was impracticable, and so the Commission unanimously held.

The opinion of the Supreme Court of Ohio, though giving its approval to the principle of mileage allocation favored by the city, does not furnish us with any formula that would make the principle a working one when applied to the Ohio system. If such a formula can be discovered, it may reduce the price at the Columbus gateway by an amount as yet unknown. Enough for present purposes that it is not discovered yet.

The formula proposed by the city, and, it seems, sanctioned by the court, would estimate the mileage by starting from a place described as the last point of major compression, and thence proceeding to the town or city where distribution is to be made. In its application to the Ohio system, such a measurement of mileage is unrelated to realities. In the first place, the compressor, wherever situated, is not the source of the supply. Gas may have traveled hundreds of miles before the process of compression starts. Conceivably these inequalities might be corrected by the aid of some law of averages. There has been no endeavor to correct them here. In the second place, no one municipality is served by any one compressor unaided by another. The system of transmission maintained by the Ohio Company with its 38 compressors scattered through the state is organized as a unit, and mileage from any single point would be an arbitrary measure of the value of the property devoted to transmission without including in the reckoning the mileage embraced in the system as a whole.

Nothing to the contrary was held in *Wabash Valley Electric Co.* v. *Young*, 287 U.S. 488, or in *United Fuel Gas Co.* v. *Railroad Comm'n of Kentucky*, 13 F. (2d) 510, 522. A municipality may be treated as the unit for determining the rates to be charged to its inhabitants. *Wabash Valley Electric Co.* v. *Young, supra.* This does not mean that allocation of values may be made by recourse to an arbitrary formula. The value of the property devoted to transmission may be measured upon the basis of mileage multiplied by demand. *United Fuel Gas Co.* v. *Railroad Comm'n of Kentucky, supra,* where the experts are stated to have agreed upon the method of division. This does not mean that a like basis will be approved when mileage contributing to the supply is omitted from the reckoning.

■ What has been said exhausts the points of difference between the decree and the report.

Other objections have been urged in respect of other points as to which the Commission and the court concurred. What has been said as to the points in respect of which they differed has brought us to the conclusion that the rate as fixed by the ordinance must be supplemented by an allowance for amortization or depletion. The appellant insists, however, that even this addition will not serve, and that confiscation will result unless there is an allowance of other items which the court and the Commission have united in rejecting. Whether that contention may be upheld is the question next before us.

Objection is made that the annual depreciation allowance ($667,612) for depreciable property other than well-structures and equipment is less than is necessary to maintain the property intact.

We considered this objection in the *Dayton* case and overruled it. In this case, however, the appellant submits a computation which is intended to prove that in

measuring depreciation certain items of property, such as land and rights of way, have been omitted altogether. The record tells us nothing as to the location of this property or its present or prospective uses. Whether it has relation to the operated fields or the fields to be opened in the future there is nothing to inform us. Certainly land and rights of way may not be characterized as wasting assets in the absence of explanation that would stamp that quality upon them. In saying this we do not forget that an abandonment of the business might bring about a sharp reduction in the value of the plant, aside from well-structures and equipment. There is nothing to show, however, that any such abandonment is planned or even reasonably probable. On the contrary, the course of business makes it clear that when the fields in use shall be exhausted, the business will extend to others, and this for an indefinite future, or certainly a future not susceptible of accurate estimation. We find no reason for a revision of our conclusion that the depreciation reserve has not been proved to be inadequate.

Objection is made also as to the disallowance of a going value for the affiliated companies. Going value was excluded both by court and by Commission as an item of property to be separately appraised and separately reported. The record justifies a holding that it was reflected in the other items and particularly in the appraisal of the physical assets as part of an assembled whole. Cf. *Hardin-Wyandot Lighting Co.* v. *Public Utilities Comm'n,* 118 Ohio St. 592, 603; 162 N.E. 262.[3] This, we think, was adequate.

[3] Going value, of course, is not to be confused with good will (*Los Angeles Gas & Electric Corp.* v. *Railroad Comm'n,* 289 U.S. 287, 314), and is not to be " read into every balance sheet as a perfunctory addition." *Dayton Power & Light Co.* v. *Public Utilities Comm'n, supra.*

The going value of the Columbus property must have been small, if not nominal, for the business, though broader in its beginning, had been narrowed in the course of years to one of distribution only. Cf. *Dayton Power & Light Co.* v. *Public Utilities Comm'n, supra.*

The going value of the Ohio Fuel Gas Company was placed by the appellant's witness at a figure so high ($12,000,000) as to be excessive almost on its face, and the impression of exaggeration is confirmed when the appraisal as a whole is resolved into its elements.

Thus, some of the appellant's experts have included interest or return unearned during the business development period as a factor contributing to going value, one witness placing this factor as high as $6,300,000. Their method of computation was condemned by this court in *Galveston Electric Co.* v. *Galveston,* 258 U.S. 388, 394, in very similar conditions. No evidence was offered by the appellant that expenses had been incurred " in overcoming initial difficulties incident to operation and in securing patronage." *Galveston Electric Co.* v. *Galveston, supra.* On the contrary there is evidence as to the business in Columbus that customers were clamoring for an extension of the service, to such an extent that a suit was begun for a mandatory injunction. The sales by the Ohio Company and the United to the extent of more than half in value were made to their own affiliates. In such circumstances, the base value is not greater because of losses at the beginning than it is where there is no development cost because the success of the business has been " instant and continuous." *Galveston Electric Co.* v. *Galveston, supra,* p. 396.

Other experts, who reject the factor of interest unearned during the period of development, build their estimates of going value upon the cost of attaching new customers to the business, a cost not taken from the

books, but merely presumed or estimated at widely variant amounts. So far as such expenses had been actually incurred by any affiliated company, they had already been included as part of the cost of operation. So far as value had been added above the moneys thus expended, there was not even approximate precision in measuring its amount. The burden of building up patronage may be negligible where there is little competition with any other producer or with other kinds of fuel. *Charleston* v. *Public Service Comm'n, supra.*

Other experts, testifying to an aggregate, without assigning a proportion to the contributory factors, give estimates so vague as to be little more than guesses, one of them, for illustration, holding to the opinion that ten would be a fair percentage, yet unable to give a reason why the amount should not be less or greater.

From the testimony as a whole one gains a definite impression that the opinions are derived for the most part from a professed experience and understanding of business conditions generally, and very little from any knowledge of the " history and circumstances of the particular enterprise." *Los Angeles Gas & Electric Corp.* v. *Railroad Comm'n, supra;* cf. *Houston* v. *Southwestern Bell Tel. Co.,* 259 U.S. 318, 325.

We cannot find that the Commission and the court went beyond the bounds of a legitimate discretion in putting aside these estimates as too uncertain to be followed.

Objection is made that there was an inadequate allowance ($68,196) for the annual depreciation of the physical assets in Columbus.

The value of those assets, together with general overheads, as fixed by the Commission was $3,927,647. The depreciation reserve at the end of 1929 was $1,166,762.30, and at the end of 1930 $1,251,886.77. On the other hand the accrued depreciation (which was taken at the com-

pany's own figures) was only $710,659 as compared with a reproduction cost new of $4,638,326.

The Commission determined that in view of the large reserve and the good condition of the plant, the allowance asked for by the company ($174,880.24) was too high, and that $68,196 was adequate.

This is slightly less, it is true, than the amount ($88,-695.03) suggested by a witness for the city, but the Commission was at liberty to form its own judgment. In any event the rule of *de minimis* is applicable where the difference is so trivial in its effect upon the rate. *Dayton Power & Light Co.* v. *Public Utilities Comm'n, supra.*

Other objections not covered by the opinion in the *Dayton* case are concerned almost wholly with inferences of fact as to which the concurrent conclusions of the court and the Commission must be accepted as conclusive.

We have not been unmindful in what has been written that the affiliated sellers (the Ohio and the United) are not parties to this proceeding nor bound by our decree. None the less, under the law of Ohio, they must serve their affiliated buyers at reasonable rates. *Ohio Mining Co.* v. *Public Utilities Comm'n,* 106 Ohio St. 138, 146, 150; 140 N.E. 143. In so far as a reasonable rate is something other or higher than one not strictly confiscatory (*Banton* v. *Belt Line Ry. Corp.,* 268 U.S. 413, 423), the difference, if any, is determined with finality by the appointed officers of the state. The only question for us in these intercorporate relations is whether the rejection of the contract as a measure of the appellant's operating expenses was a wholly arbitrary act, and thus equivalent in its effect to an act of confiscation. Neither our judgment nor that of the state court operates directly upon the contract by destroying its obligation. The measure

of judicial power in the absence of the affiliated sellers is the determination of the expenses to be borne by the consuming public.

There being error in the reduction of the appellant's operating expenses by the refusal to make provision for replenishing the wasting assets of its affiliated companies, the decree is reversed and the cause remanded to the Supreme Court of Ohio for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE MCREYNOLDS and MR. JUSTICE BUTLER concur in the result.

MR. JUSTICE VAN DEVANTER and MR. JUSTICE SUTHERLAND took no part in the consideration or decision of this case.