Application of MONTANA–DAKOTA UTIL-
ITIES CO. OF MINNEAPOLIS, MINNE-
SOTA, for Authority to Increase Rates for
Electric Service in the State of North Da-
kota.

MONTANA–DAKOTA UTILITIES COM-
PANY, Appellant,

v.

PUBLIC SERVICE COMMISSION of the
State of North Dakota, Respondent.

No. 7777.

Supreme Court of North Dakota.

March 23, 1960.

Rehearing Denied April 22, 1960.

Cox, Pearce & Engebretson, Bismarck, and Earl H. A. Isensee, Minneapolis, Minn., for appellant.

Leslie R. Burgum, Atty. Gen., Gerald G. Glaser, Commerce Counsel, Bismarck, Theodore Kellogg, Sp. Asst. Atty. Gen., for respondent.

BURKE, Judge.

This is an appeal from an order of the Public Service Commission denying an increase in electric service rates proposed by the appellant, Montana-Dakota Utilities Company.

In April 1957, the utility filed with the commission a schedule of proposed changes in electric rates which would be a substantial increase over the rates approved by the commission in 1948. Accompanying the schedule was a notice that the proposed schedule would be effective 30 days after the date of filing. On May 7, 1957, the utility filed an amendment to the proposed schedule and on June 4, 1957, the commission gave notice of a public hearing upon the reasonableness of the proposed rate increase. The hearing was commenced on July 1, 1957, and after the utility had presented evidence to support its proposal, the hearing was adjourned until October 8, 1957. After the close of the adjourned hearing, the utility notified the commission that it had put the increased rates into effect as of October 4, 1957, because of the commission's failure to make an order suspending the proposed new rates beyond the 120 day period of suspension which automatically became effective upon the ordering of a hearing upon the proposed change. In subsequent litigation, in which the commission sought an injunction, prohibiting the utility from charging the new rates, we held that the new schedule had gone into effect, upon the failure of the commission to order an additional suspension beyond the 120 day automatic suspension. State ex rel. Public Service Commission v. Montana-Dakota Utilities Co., N.D., 89 N.W.2d 94.

Thereafter, on January 24, 1958 the commission made and entered its order disallowing the proposed increase. An appeal

from this order, to the District Court of Burleigh County, was taken by the utility. Upon the appeal the district court entered a judgment affirming the order of the commission and the utility has appealed from the judgment.

■ Before proceeding to a consideration of the merits of the rate controversy it is necessary first to dispose of appellant's contention that the commission was without jurisdiction to make its order of January 24, 1958. Upon this contention appellant argues that the commission, by its failure to order a suspension of the rates, allowed the proposed schedule to become the legally established rates for the utility to charge; that the continuation of a hearing thereafter to determine whether such rates should become the legally established rates was without valid legal purpose, and that the subsequent order of the commission rejecting a proposal which had previously become legally effective was without jurisdiction and of no effect. Appellant concedes the continuing jurisdiction of the commission but urges that the commission, having let one proceeding lapse by a procedural deficiency, could not consider the reasonableness of the proposed rates or make any orders with respect thereto except in a new proceeding in which it should have burden of establishing that the legally established rates were unreasonable.

We might consider this a valid argument if we could accept the premise that the termination of the period of suspension of the proposed rates operated to terminate the proceeding to determine the reasonableness of those rates. This we cannot do. The applicable statute provides:

"* * * pending the hearing and decision thereon, such rate, classification, contract, practice, rule, or regulation shall not go into effect, but the period of suspension thereof shall not extend more than one hundred twenty days beyond the time when it otherwise would go into effect, unless the commission extends the period of suspension

for a further period not exceeding six months * * *." Sec. 49–0506, ND RC 1943.

This statute relates only to the suspension of a change, in the categories named, pending hearing and decision. If the procedure prescribed by the statute for the suspension of rates is not followed, the result is that the rates are not suspended pending hearing and decision and the rates become effective, not as finally and legally established rates, but as conditionally legal rates subject to the decision in the pending hearing. As was said in City of Edwardsville v. Illinois Bell Telephone Co., 310 Ill. 618, 142 N.E. 197, 199:

"The Commerce Commission might still proceed with its investigation and inquiry and pass upon the schedule and find what were just and reasonable rates, and the appellant would be bound to observe those rates; but until such finding and determination it was legally entitled to put in force the rates fixed by schedule."

The fact that the commission failed to suspend the rates in no way affects its jurisdiction or the nature of the hearing.

Upon the merits of this case there is no issue as to fact. The controversy arises out of the interpretation to be put upon the facts and upon the law applicable thereto. For the purpose of determining the fairness of the proposed new rates, 1956, the year immediately prior to the proposal, was selected as the test year.

Evidence offered by the utility tended to establish a year end value of its electric plant, allocated to North Dakota, in the sum of $22,413,645, working capital in the sum of $294,767, and inventory and supplies in the sum of $732,483 or a total claimed rate base of $23,212,895. Its claimed net operating revenue for 1956 was $956,339. Upon these figures the computed return to the utility was 4.2 percent. Testimony was also introduced to the effect that for businesses involving like security and risks a fair rate of return was 6½ or 7 percent.

In its findings the commission made reductions in the claimed rate base as follows: elimination of plant under construction, $958,681; reduction to attain average net plant $279,669; reduction to attain average contributions in aid of construction, $6,705. These deductions amounted to $2,750,220 and resulted in reducing the rate base to the sum of $21,137,675. The commission also found increases in net income by adding thereto an adjustment for average plant depreciation in the sum of $9,664, merchandising operations rentals in the sum of $18,455, income tax deferrals in the sum of $175,421, income from the Knife River Coal Co. in the sum of $39,388 and a credit for customer accounting in the sum of $8,529. These total additions to net income in the sum of $251,457 resulted in a finding by the commission of a net income of $1,207,796 and a finding of a rate of return for the test year of 5.71 percent. This rate of return was found to be reasonable and upon that basis the proposed rate increase was denied. Each of the commission's deductions from the rate base and each of its additions to income has been specified as error by the utility.

■ The utility specified that "The Commission erred in excluding from the rate base, properly to be used in calculating the company's rate of return the full sum of $958,681.00 designated as 'plant under construction' for the reason that the evidence shows without contradiction that a substantial part of the said sum represented plant and capital additions actually placed in service prior to the conclusion of the hearings in this proceeding." The argument with respect to this specification points out a fundamental difference between the commission and the utility in their approach to the issues in the case. It is the commission's position that the basic fact to be found is the utility's actual rate of return for the test year 1956 and that this figure should be used as a point of departure in making a determination as to whether the established rates will continue to yield a fair return. The utility contends that since the hearing is for the purpose of establishing future rates a new plant put in operation in October 1957, and other additions to be put in operation in 1958 should be included in the rate base. The fundamental error in the utility's position is that it would project investments in plant facilities into the future but would not make any allowances for a reasonably to be anticipated increase in income which the additional and more efficient facilities would produce. The utility would, in effect, apply the 1956 income to the rate base of a subsequent year to determine a fair rate of return. We are agreed that the action of the commission in deleting this item from the 1956 rate base in its computation to determine the actual rate of return for 1956 was proper. By the provisions of 49–0601, NDRC 1943, the valuation for determining the reasonableness of rates is:

"* * * value of the property of every public utility used and useful for the service and convenience of the public * * *."

Where the inquiry is to determine the actual rate of return earned by the utility in a prior year, the valuation upon which the computation should be made is the value of the utility's property used and useful for the public service during that year. Northern States Power Co. v. Board of Railroad Commissioners, 71 N.D. 1, 298 N. W. 423; Northern States Power Co. v. Public Service Commission, 73 N.D. 211, 13 N.W.2d 779. Since the installations above referred to were not used for the service of the public in 1956, their value was properly excluded from the 1956 rate base.

■ Directly related to the foregoing specification of error is the specification that the commission erred in a deduction made from the utility's valuation figures to determine the average rate base for 1956. It appeared from the evidence that certain additions had been made to the utility's plant during the year 1956 and that the figures submitted by the utility represented

the year end valuation. From this valuation the commission deducted $279,667 to arrive at the average rate base for the year. The utility does not question this computation or say that the resulting figure does not fairly represent average valuation. Its sole contention is that year end rather than average valuation should have been used. The argument made by the utility is that year end valuation would more accurately demonstrate whether the 1956 rate would be adequate in the future. The utility's argument would be persuasive if its sales of electrical energy and net income were not rapidly increasing in volume. For the three years prior to 1956 the sales of electrical energy had increased by about 30,000,000 KWH a year and net revenue had increased approximately $500,000.00 a year. Presumably the increase was a month by month increase with proper allowances for seasonal variations. Therefore, to apply the year's net income to the year end valuation to find the rate of return for the year, would yield inaccurate results. In considering this same question the Supreme Court of New Hampshire said:

> "The record indicates that this utility is a growing and expanding one, that its increase in plant will produce greater capacity and productivity, and more customers and revenue. In such a case average earnings throughout the year 1951 will be less than at the year end. The determination of additional revenue to produce a reasonable return in such an expanding utility cannot fairly be calculated by using a year-end rate base and the average earnings from the preceding year. In a case like this the rate base should relate to the period for which the earnings are being tested in order to reach a just result * * *." Chicopee Mfg. Co. v. Public Service Co., 98 N.H. 5, 93 A.2d 820, 828. This deduction is therefore sustained.

■ We turn our attention next to the utility's specification that the commission erred in offsetting against allowances for working capital, materials and supplies the average monthly balances of the utility's reserves for taxes. The utility's evidence of a requirement of working capital in the sum of $294,767, and of an average inventory of materials and supplies in the sum of $732,483 is not questioned by the commission. The commission found, however, that the average balance in the utility's reserves for taxes amounted to $843,-575 and that this balance was being used by the utility to meet its cash and inventory requirements. It therefore deducted the amount of $843,575 from the $1,027,250 which the utility claimed was needed for these purposes. The utility argues that the principle involved is contrary to good accounting practice. It is stated: "No one should be encouraged, let alone required, to invest tax money in materials and supplies or advance the use thereof to customers. When the time comes to pay taxes, it is no excuse for nonpayment that you have the money invested in material and supplies or that you have extended credit to your customers through the use of the money." The statement made by the utility may be correct as a theoretical proposition, but the question here is not what the utility should be encouraged to do, but what it actually has done and is doing. With reference to these reserves the utility's auditor was asked:

> "Q. And that amount is an amount that is received and held by you for the purpose of paying these taxes as they accrue? A. That is an amount that we have provided out of income, yes.

> "Q. And, of course, you use it until you have to pay the tax. You use it for other purposes? A. Well, it becomes a part of our corporate cash, sure."

The company's consolidated statement as of January 1, 1956, (including the gas utility and other businesses as well as the electric utility, both interstate and intrastate) showed cash on hand of $2,999,-240.45. On that date the reserves for

taxes, exclusive of the reserve for deferred income taxes were $4,506,428. Since the testimony of the auditor was that reserves for taxes became part of the corporate cash, these figures demonstrate that as to the overall operations of the company tax reserves were being used to conduct the company's business. Also the reserve for income taxes on February 1, 1956, was $3,467,000 while the income taxes for the entire year of 1956 amounted to only $2,665,000. Thus, although income taxes were paid quarterly, the reserve in February exceeded the whole year's requirements by approximately $800,000. At no time in the year .did the reserve for income taxes drop below $1,500,000 or the reserve for other taxes below $800,000. The commission found the average monthly balances in these tax reserve accounts and allocated average monthly balances to the North Dakota electric utility, available and used for working capital, material and supplies, in the total sum of $343,575. Neither the computation nor the method of allocation are challenged. The commission's action in this regard was not novel. It is supported by substantial precedent.

A recent decision of the Public Service Commission of Delaware held that where the utility's balance sheet disclosed credits for cash which greatly exceeded its debits for cash and where it was clear that the credits in question were not supplied by the company's investors, that the company should not be allowed an amount for cash working capital. In the Matter of Diamond State Tel. Co. CCH PUR 17,830.04. In City. of Cincinnati v. Public Utilities Commission, 161 Ohio St. 395, 119 N.E.2d 619, at pages 625–626, the court said:

"We are of the opinion, and so hold, that customers' contributions in the form of accruals for the payment of taxes, deposits to secure the payment of customers' bills for services or as advances on installation charges, and collections for rents to be paid at future dates, which will be constant with reasonable certainty in the foreseeable future and which are available for working capital and for investment in materials and supplies, should be used to offset the rate-base allowance for working capital, including the investment in materials and supplies * * *."

To the same effect is the decision in the Petition of Mountain States Tel. & Tel. Co., 76 Idaho 474, 284 P.2d 681. See also decisions of Public Service Commissions in P. S. C. U. So. Bell Tel. Co. (Mississippi) 1956 CCH 17,374.03; Matter of Cumberland Gas Co. (Maryland) 1956 CCH 17,414.03; Acme Brick Co. v. Comm. (Arkansas) 1956 CCH 17,483.05; Matter of Joplin Water Co. (Missouri) 1956 CCH 17,759.04. For the reasons stated we sustain the commission's handling of this item. The reduction to attain average contributions in aid of construction in the sum of $6,705 is also sustained for the reasons stated in our consideration of the reduction to attain average net plant.

In addition to the adjustments of the rate base the commission made adjustments in the utility's operating statement which had the effect of increasing the utility's computation of income by $251,457. All of these adjustments are specified as error.

■ The first of these adjustments was one to obtain average plant depreciation for the year 1956. As has been heretofore stated, the utility's valuation figures gave a year end plant valuation. Its depreciation likewise was taken upon a year end basis. That is to say: all physical assets were charged with a full years depreciation without regard to the time, during the year, at which they were acquired or put into operation for the public use. Since we have allowed average plant valuation in the rate base, it follows that we must also allow average depreciation. To apply the larger depreciation to the smaller valuation would result in excessive depreciation.

■ Two of the other additions the commission made to income we shall consider together. They are an $18,455 credit which the commission says should have been paid to the utility as rental for the space occupied by its merchandising departments and an $8,529 credit to utility income for servicing the merchandise accounts.

As to these items the only evidence in the record is that in North Dakota the utility has 23 merchandising outlets which did a gross business in the sale of electrical appliances, equipment and services in the sum of $396,251.82.

In its decision, the commission, after stating that there was no evidence in the record as to the amount of space used, nor the cost or value of the space and services furnished, stated: "It will be necessary for the commission to make an allocation which appears reasonable to it of the value of such (space and services)." The commission then proceeded to find that the reasonable value of such space and services was 10% of the gross sales or $18,455 after allowance for income taxes. The commission also found that the utility's total expense for servicing accounts was $279,170 and that the merchandising departments should bear the same proportion of this expense as the merchandise sales bear to merchandise and electric sales. This computation resulted in a credit to the utility income in the sum of $8,529 after making an allowance for income tax. The result is that the utility has added an overhead expense to the merchandising operations of approximately 15% of the gross sales. Since the operation of the merchandising department resulted in a net profit of only 5% of the gross sales, this calculation inflicts a loss of about 10% of the gross sales upon the merchandising operations of the electric utility in North Dakota.

■ We are agreed that these findings by the commission cannot stand as they are not supported by any evidence. The stat-ute relating to the scope of appeals from administrative agencies expressly provides that the decision of the agency shall be affirmed unless " * * * the findings of fact made by the agency are not supported by the evidence, * * *." Sec. 28–3219, NDRC 1943. The commission has attempted to justify its action by stating that the utility did not furnish the necessary evidence although it was advised so to do. Such a default, if it be one, is not sufficient to authorize the commission to act without evidence. Although what we have said above disposes of the issues relating to these two items, we think some mention should be made of another defense raised by the utility thereto. The utility contends that these two findings violate a rule of the commission. The only evidence of such a rule appears in the testimony of Mr. Shumway Bird, a witness called by the commission. He testified: "Montana-Dakota Utilities Company carries on all of its accounting functions in accord with the Uniform System of Accounts prescribed by the Federal Power Commission, and adopted or followed by the North Dakota Public Service Commission. * * * It has been our conclusion that generally speaking the revenues and costs which are related to the merchandising operations of the company are classified to that operation upon a reasonable basis." The evidence is not by any means conclusive that the commission had adopted such a rule or established such a practice. If the rule had been adopted, it would have been binding on the utility and the commission's decision in this respect would penalize the utility for doing what it was required to do.

■ We turn now to the specification that it was error for the commission to credit utility income with $39,388 which it found was excess profit earned by the Knife River Coal Mining Company. The coal company is owned by the utility and 45% of the coal company's output is purchased by the utility. The utility's original investment in the coal company was found

to be $327,161 and the coal company's earnings were found to be $197,777 or 60% of the original investment. No consideration was given to the coal company's surplus or investments subsequent to the original purchase. By a process of allocation according to several applied ratios $39,388 was added to the utility income. The commission attempts to justify this allocation under the provisions of Section 49–0202, Supp. NDRC, Subsection 6 of this section provides:

> "The public service commission may in its discretion require proof that no unreasonable profit is made in the sale of materials to or services supplied for any utility company by any firm or corporation owned or controlled directly or indirectly by such utility company or any affiliate, subsidiary, parent company, associate, or any corporation whose controlling stockholders are also controlling stockholders of such utility company, before permitting the value of said materials or services to be included in valuations or cost of operations for rate making purposes. If unreasonable profits have been made in any such transactions, valuations of said materials and services may be reduced accordingly."

Under the foregoing statute it is clear that the commission, if it found, upon substantial supporting evidence, that the utility had paid the coal company an excessive price for the coal it had purchased, that price could have been reduced accordingly, but there is no authority to apportion a part of the coal company's profits to the utility. The Vice-President of the Knife River Coal Company testified that the company also sells coal to the Otter Tail Power Company and the Valley City Electric; that Montana-Dakota pays exactly the same price charged to other utilities and that this price is lower than that charged by other producers of lignite. This evidence does not support a finding of excessive profits upon the coal company's transactions with the utility. The evidence indicates that the coal was purchased at its fair market value and that there was no discrimination by which the utility or its rate payers suffered.

It was also specified that it was error for the commission to add to the utility's income the sum of $175,421 which the utility considers to be income tax deferrals. The question has arisen because the utility has elected to take advantage of liberal depreciation and rapid amortization for income tax purposes as allowed by Sections 167 and 168 of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 167, 168. As an alternative to "straight-line" depreciation, Section 167 allows a taxpayer to adopt the "declining balance" method using a rate not exceeding twice the rate which would have been required under the "straight-line" method. Thus an asset with a life of 20 years of the value of $100, under the "straight-line" method would be depreciated 5% of its value or $5 each year for 20 years. Under the "diminishing balance" method the asset could be depreciated 10% of its value the first year, and 10% of the successive remaining balances each year thereafter. The result of adopting the "diminishing balance" method is that the allowable depreciation for the first six years of the life of the asset is greater than it would be under the "straight-line" method, that after six years it would be less, and at the end of 20 years there would remain in excess of 12% of the value of the asset still undepreciated. Section 168 of the Revenue Act provides that certain installations, certified by an authority designated by the President, as necessary in the interest of the National Defense, may, in lieu of depreciation be amortized over a period of sixty months. At the end of the 60 months no further depreciation will be allowed. The utility has one facility which has been certified in accordance with the provisions of Section 168.

By taking advantage of the liberalized depreciation and the rapid amortization allowed by these sections, the utility di-

minished the amount of federal income tax payable in 1956 by $175,421 less than what it would have been had "straight-line" depreciation been used. The amount of the decrease due liberalized depreciation was $13,093 and that due to rapid amortization was $162,238. The utility urges that these decreases are not actual savings but are simply income tax deferrals which will have to be paid in the increased income taxes during later years when the depreciation allowable will be less than "straight-line" depreciation. For this reason the utility says that the income taxes should be "normalized" for rate making purposes. That is to say: that the utility should be permitted to charge against income the amount the income taxes would have been had "straight-line" depreciation been used in computing the tax. This method, it is said, will eliminate any discrimination between present and future rate payers and it will effectuate the intent of Congress in enacting these sections.

The commission held that only the income taxes actually paid could be charged against income and added the difference between what was paid, and that which would have been paid had "straight-line" depreciation been used to the utility's reported income. The position of the commission is founded upon the premise that all utility revenue is derived from the rate payers and that any surplus revenue over and above actual expenses in any year must be used for the benefit of the rate payers either by crediting the surplus to the utility income or by charging the utility interest for the use of the money.

 The two items present different problems as there are substantial differences between "liberalized depreciation" allowed by Section 167 and "rapid amortization," allowed by Section 168. Section 167 allows liberalized depreciation of all tangible property, having a useful life of more than three years, constructed or acquired after December 31, 1953. It limits the rate under the "declining balance" method to twice the "straight-line" rate. While

one of the expressed intentions of Congress in enacting this law was to maintain "the present high level of investment in plant and equipment," it was also stated that liberalized depreciation better represented the actual depreciation of assets. H.R. Rep.No.1337, 83rd Cong., 2nd Sess. 24 (1954) S.Rep.No.1622, 83rd Cong., 2nd Sess. 26 (1954), U.S.Code Cong. and Adm.News 1954, p. 4017. We cannot read into this statute either by reference to the law itself or by reference to its legislative history a Congressional intent to defer income taxes and thereby provide the taxpayer with an interest free loan during the early years of the life of an asset. We think it more reasonable to conclude that the Congressional intent was to encourage investment by permitting investing taxpayers to compute depreciation upon a basis which more nearly approximated actual depreciation than the "straight-line" method did. Certainly the "straight-line" method is not free from infirmities. It is based upon an assumption that the annual dollar depreciation of a facility is the same during each year of its useful life. It is not vested with an infallibility that requires its use in order to determine the annual decline in the value of an asset or net income accurately. It may well be that another method will more accurately delineate the economic status of certain businesses and all Section 167 does is to permit the taxpayer to elect which of several methods he will adopt. We think therefore that the commission's treatment of this item was correct.

 The rapid amortization, allowed by Section 168 of the Revenue Code, which permits a facility which has been certified as an emergency facility to be amortized over a period of five years has very little relation to actual depreciation. Section 168 was a reenactment of Section 124A of the Revenue Code of 1950, 26 U.S.C.A. § 124A. The intent of Congress in enacting Section 124A has been authoritatively stated by the U. S. Court of Appeals of the District of Columbia in City of Detroit,

Mich. v. Federal Power Commission, 97 U.S.App.D.C. 260, 230 F.2d 810, 822, certiorari denied Panhandle Eastern Pipe Line Co. v. City of Detroit, Mich., 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48. In this case the court said:

"* * * the intent of Congress reflected in section 124A is not to benefit consumers but rather the taxpayer in order to encourage the construction of certain emergency types of facilities. Were the tax savings deducted from the rate base, the taxpayer would not receive the intended benefit. The valuations upon which it is entitled to earn a fair rate of return would be decreased by the amount of the savings. In placing the savings at the disposal of Panhandle under the limitations specified, the Congressional intent is effectuated. The funds go into a reserve account for the payment of deferred taxes to accrue after the five year amortization period. Though thus earmarked, the funds are available for income-producing purposes. Unless this is permitted, it is difficult to see how Panhandle could benefit substantially from Section 124A. This statute, unlike the Natural Gas Act [15 U.S.C.A. § 717 et seq.] itself, is not for consumer benefit. It has a different public policy and should be given effect as intended by Congress. Furthermore, the solution of the Commission does not result in higher rates to the consumer. It simply does not operate to reduce them. It aids Panhandle but neither aids or harms petitioners. We think this is the result sought by Congress."

In the cited case the proposal was to deduct the tax savings due to rapid amortization from the rate base upon the theory that these savings constituted additional capital furnished by the rate payers. In the instant case the commission has added tax savings to income. This treatment results in a greater detriment to the taxpayer than a deduction from the rate base. While accounting for tax purposes ordinarily does not control regulatory authority over rates, it is not within the province of a regulatory commission to nullify congressional action by destroying the incentive to emergency construction, which Congress deemed essential to the national economy. A state may not encroach upon the supremacy of federal legislative action. Article VI, Constitution of the U. S.; Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313; Public Utilities Commission of State of California v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470. It follows that the commission erred in crediting the tax savings due to rapid amortization to income.

So far we have found that commission's findings as to the utility's rate base for 1956 should be sustained. We have also found that the commission's computation of utility income should be reduced by a total of $228,610. Deducting this sum from $1,207,796 which was found to be the utility's income for 1956, there remains a balance of $979,186. The latter sum is 4.6+ of the adjusted rate base of $21,137,-675. This rate of return is 1.1% less than the 5.71% rate of return found by the commission for 1956.

Since we have found that the rate of return of 5.71% as found by the commission is not sustained by the evidence we do not consider whether such a rate of return is a reasonable one. That question has become moot and this case must be returned to the commission for a new finding as to the rate of return for 1956.

There remains for consideration the question of the extent to which a finding of the rate of return for 1956 is determinative of the rate of return the 1956 rates will produce in the future. The utility takes the position that the rate of return for 1956 is not a fair criterion by which to estimate what rate of return the 1956 rates will produce in subsequent years for the reason that the rate base of the utility was substantially increased by new

plant additions which were already in operation for the public use at the time of the hearing and that the expense of operation would also be increased by a new labor contract effective July 1, 1957, and by increases in interest, taxes and other expenses.

In its treatment of these contentions the commission, in its brief states: "We do not believe there is any substantial issue upon this subject in view of the plain state of our law, although as has been pointed out, the appellant strenuously and repeatedly in the various specifications contends that this should be allowed because rates are prospective, losing sight of the fact that we are not at this point considering the prospective character of the rates, but are considering what the company actually earned on its actual rate base in 1956 for the purpose of using such actual rate of return as a guide. We concede that property which will become in the near future a part of the rate base, may be taken into consideration, but that the commission must also take into consideration other factors such as the trend in increase in earnings and other factors that might be apt to influence the rate of return in the future." The commission thus recognized the propriety of taking into consideration an increase in the rate base and increased expenses.

■ The determination of a rate of return for the year 1956 upon the average rate base for that year was but a point of departure for the determination of the real issue in the investigation. This was to determine whether the rates complained of would continue to yield a fair rate of return for a reasonable time in the immediate future. McCardle v. Indianapolis Water Co., 272 U.S. 400, 47 S.Ct. 144, 71 L.Ed. 316. In making this calculation the rate base should be adjusted to include facilities in imminent or present use at the end of the test year. Columbus Gas & Fuel Co. v. Public Utilities Commission, 292 U.S. 398, 54 S.Ct. 763, 78 L.Ed. 1327, 91 A.L.R. 1403; Northern States Power

Company v. Public Service Commission, 73 N.D. 211, 13 N.W.2d 779.

■ However, where, as in this case, the net revenues of the utility are constantly increasing, to apply the 1956 income to a rate base adjusted for the future would result in a distorted picture. In order to approximate what the true rate of return would be, it would be necessary to estimate what the income would be during the time the added facilities were in use. The commission's findings show no computations in this regard. It reviewed the financial history of the company for a period of seven years and it found that annual increases in income had kept pace with the annual increases in expenses and rate base. The commission held that there was no proof or reason to believe that this automatic adjustment of increased income to increased rate base and expenses would not continue and that therefore if the rates complained of had yielded a fair return in 1956, there was no proof that they would not continue to do so.

Upon the basis of the evidence we think this conclusion of the commission was justified. The method adopted by the commission did take into consideration both increases in rate base and expenses and increases in income. The utility did not submit comparative operating statistics of the electric department. Those submitted were for the utility's gas and electric businesses combined. These show a net income for 1955 in the sum of $6,688,643 and for the 1956 year in the sum of $7,437,035 or an increase in 1956 of about $750,000. If a share of the increase is apportioned to the electric department in the same proportion as its gross sales bear to the total sales of the company, the amount of increase attributable to the electric department will be $312,500, or sufficient to pay a 6% return on an increase in rate base in excess of $5,000,000. The record demonstrated that similar increases were to be expected in the future. The use of a rate of 6% for test purposes is not to be con-

strued as a suggestion as to what the rate of return should be.

The utility argues that its favorable financial position is due to the prosperity of its gas department but it has presented no evidence to demonstrate this claim. The burden was on the utility to show that the proposed new rates were just and reasonable Section 49–0506, NDRC 1943. The commission's conclusion was justified upon the evidence submitted. If more complete and detailed evidence would show the contrary, the default in the proof is attributable to the party which had the burden of proof.

The case is therefore returned to the commission for the purpose of making a new computation of the rate of return for 1956 and a new finding with respect to reasonable rates to be charged. In making its decision the commission is not limited to saying "aye" or "nay" to the utility's proposal but it may order any schedule of rates which will yield the utility a just and reasonable return. Section 49–0506, NDRC 1943.

SATHRE, C. J., and MORRIS, J., concur.

On Petition for Rehearing

BURKE, Judge.

The Public Service Commission has petitioned for a rehearing in this case upon the ground that the findings of this court, as stated in the opinion heretofore filed, require an affirmance of the Commission's order denying the requested rate increase. In its petition the Commission states: "Since the company is in sound health financially, one of two conclusions must inevitably follow: either the company's supposedly unreasonable rate of return on its electric properties is being offset by excessive returns on some other portion of the business or the rate of return on its electric prop-

erties in North Dakota is, in fact, reasonable."

In so far as the first of these alternatives is concerned, it is sufficient to say that the company's electric consumers are not entitled to a bargain rate at the expense of its gas consumers and that the profits of the company's non-utility business are of no concern to the Commission except in so far as they may relate to sales of supplies to the utility business at unreasonable prices or the charging of the expenses of conducting such business to the utility business.

In so far as the second alternative is concerned this court held that the Commission's finding of a rate of return for the electric utility for the year 1956 was not sustained by the evidence. The Commission had found that the rate of return was 5.7%, that this rate of return was reasonable and that the evidence did not establish that this rate of return would not be maintained in the immediate future. This court found that the rate of return of the electric utility was 4.6% and that the evidence did not establish that this rate would not be maintained in the immediate future. The court did not find that 4.6% was a reasonable rate of return because this court has no power to fix rates, or to say, in the first instance, what is or is not a reasonable rate of return. The making of such a finding is a legislative function delegated under proper limitations to the Public Service Commission. This court upon appeal has only the power to decide whether the Commission's action was within the scope of the limitations prescribed by the legislature or whether the rate established is so unreasonable that it violates the constitutional prohibition against the taking of property without due process of law. This court therefore had no alternative except to return the case to the Commission. The petition is therefore denied.

SATHRE, C. J., and MORRIS, JJ., concur.